**UNITED STATES of America**

v.

**Terrell Lamont BYNUM, Sumeka Plummer, and Iris Johnson.**

**No. Crim. 3:00CR197.**

United States District Court,
E.D. Virginia,
Richmond Division.

Dec. 19, 2000.

Brian R. Hood, Assistant United States Attorney, United States Attorney's Office, Richmond, Virginia, for United States.

Jeroyd W. Greene, Richmond, Virginia, for Bynum.

Susan A. Kessler, Richmond, Virginia, for Plummer.

Reginald M. Barley, Richmond, Virginia, for Johnson.

## MEMORANDUM OPINION

PAYNE, District Judge.

This matter is before the Court on various motions to suppress evidence filed by each of the defendants. The parties have presented evidence and argument and submitted briefs on the issues. For the reasons set forth below, the motions are granted in part and denied in part.

## STATEMENT OF FACTS

All three defendants are charged with conspiracy to distribute heroin, possession

with intent to distribute heroin and possession of a firearm in furtherance of a drug trafficking crime. Terrell Lamont Bynum also is charged with possession of a firearm by a convicted felon and Iris Johnson is charged with making available a place for the storage, distribution and use of controlled substances. The motions seek to suppress evidence obtained in searches and seizures which occurred on February 10, 2000 and May 25, 2000 and a statement given by Johnson on February 11, 2000. The record establishes the following facts of general application. Other facts will be discussed as part of the substantive consideration of the issues to which they relate.[1]

## A. Events Of February 10, 2000

### 1. Communications With The Confidential Informant

The record contains several different versions of information that Detective John O'Connor, a member of the City of Richmond Police Department (RPD), received on the evening of February 10, 2000 from a confidential informant. O'Connor testified at the September 22 hearing that on February 10 at about 7:30 in the evening, a confidential informant informed him that a male, known as "Boo–Man," was in possession of a large quantity of heroin, was dealing heroin in Walcott Place, and was selling it that evening in the cul-de-sac on Walcott Place. 9/22 Tr. 55–57. Later that evening, O'Connor prepared an affidavit to support issuance of a search warrant. It contained the following recitation of that information which O'Connor received from the confidential informant:

> On 02–10–00 this affiant received information from a Confidential Reliable Informer (CRI) who stated that with in [sic] the last 72 hours of the filing of this affidavit for search warrant that he/she

had observed a short dark complicated [sic] black male, nick named [sic] "BOO MAN" in the dead end of Walcott Pl. The CRI stated that BOO MAN was dealing heroin in front of his apartment. The CRI stated that BOO MAN lived in, and deals heroin from 2234 Walcott Pl. He/she stated that BOO MAN had heroin on his person, and also hides it in the gas tank of his car. The CRI described the car as a Grey Cadillac with silver tinted windows, and a black ragtop.

> The CRI stated that this is an ongoing event. The CRI has been inside the apartment, and observed firearms.

> The CRI stated that he/she has observed in the past a female who lives there selling marijuana from inside the apartment.

Gov't Ex. 1.[2]

According to testimony given by O'Connor on September 22, he had received other information from the confidential informant on the evening of February 10. 9/22 Tr. 57. In particular, the informant reportedly also had told O'Connor that Boo–Man "had quite a bit of heroin, that he had some in his crotch, that he kept it in his Cadillac, described the Cadillac, that he made trips out to the—out of the area frequently, back and forth to the apartment delivering drugs, that they were—this group was beefing with another group from Mosby Court over a dispute at a dance hall or something." Id. None of that information found its way into the affidavit which supported the application for search warrant.

O'Connor is in the habit of carrying a tape recorder with him and a tape recording, which records events just as he was beginning the February 10 search, contains the following description of what

---

1. Evidence was taken on September 22 and September 28, 2000. The transcript of September 22 will be cited "9/22 Tr." and the transcript of September 28 will be cited "9/28 Tr."

2. O'Connor's notes of the conversation with the confidential informant reflect some, but not all, of the information reported in the affidavit. Gov't Ex. 6.

O'Connor was told by the confidential informant:

[A]t 7:30 I received information from confidential informant that Boo–Man, a short black male with dark skin, possibly named John Sanders, is dealing heroin in the Creighton Court area. Supposedly ???? supplies all the people on the corner, and Creighton and Fairfield. The CI has seen him doing this over the past several months. Saw him at 6:30 with an amount of heroin, dealing from, in Walcott Place, supposed to stay in the end apartment next to Sequel Senxxxxx apartments and he's also seen him with several firearms. Says, the CI says that he keeps the heroin in his crotch and in his gas cap of his cadillac [sic] which is a silver cadillac [sic] with silver tinted windows and a black ragtop.

Gov't Ex. 3.

Sergeant Scott Shapiro, also of the RPD, was working with O'Connor at 7:30 PM, February 10, when O'Connor received information from the confidential informant. 9/22 Tr. 31. They were on assignment to a case that is unrelated to this case or these defendants, but their mission had been frustrated about the time that the informant telephoned O'Connor. 9/22 Tr. 31.

Shapiro and O'Connor testified that O'Connor wanted to use the informant's report to obtain a search warrant. However, the sergeant in command of their unit declined to authorize a search because there was insufficient personnel to implement a warrant, if one could be obtained. 9/22 Tr. 32–33; 109–10.

### 2. The "Knock And Talk" And The Alleged Consent

O'Connor and Shapiro then determined to drive by 2234 Walcott Place "to see if there was any activity going on." 9/22 Tr. 36. Upon arrival at 2234 Walcott Place, they saw a Cadillac of the type mentioned by the informant. It bore a license plate similar to the one described by the informant. 9/22 Tr. 164. They then determined to go to the apartment identified by the informant, notwithstanding that they did not have a search warrant. Accordingly, they approached the apartment and knocked on the door for the purpose of "get[ting] consent, develop[ing] probable cause, or get[ting] information on the community." 9/22 Tr. 85–86. However, the main objective of this effort, according to O'Connor, was to secure consent to search the residence. 9/22 Tr. 87.

This technique has been dubbed by O'Connor (and perhaps the officials of the RPD) as a "knock and talk." 9/22 Tr. 84. The evidence developed at the hearing on these motions demonstrates that the purpose of the technique is to obtain consent to talk to the residents, then ask permission to enter the residence to have the discussion and, while inside, walk around and examine whatever is in open view and to inspect trash cans, all to the end of developing probable cause to support issuance of a search warrant. 9/22 Tr. 87–91.

O'Connor and Shapiro employed this technique on the evening of February 10 for those purposes and to secure consent to search 2234 Walcott Place. O'Connor started the process by knocking on the door. A person named Kenyon Brown (who did not reside there) answered the knock. Brown did not resemble the description of Boo–Man and O'Connor had no reason to believe that Brown lived in the apartment. 9/22 Tr. 172–174. Nonetheless, O'Connor asked if he could come in and talk to Brown. Gov't Ex. 3, p. 3; 9/22 Tr. 91. Brown responded by asking: "Why?" Gov't Ex. 3, p. 3; 9/22 Tr. 92. O'Connor understood that Brown's question did not confer permission to enter the house. 9/22 Tr. 92. O'Connor responded to the question by informing Brown that there had been reports of drug activity at the location.

O'Connor and Shapiro testified to somewhat different versions of what happened next. However, there is a tape recording made by O'Connor while the events were

taking place. Gov't Ex. 3. The transcript of that recording shows, rather clearly, what actually occurred and resolves the inconsistencies between the testimony of O'Connor and that given by Shapiro. In particular, the transcript reflects the following:

> Can I come in and talk to you for a second?
>
> Why?
>
> Why? Cause we got reports of drug activity. You mind taking your hands out of your pockets? Could I pat you down?
>
> Yes.

Gov't Ex. 3, p. 3.

The request to enter the residence and "talk to you for a second" was held in abeyance because O'Connor became concerned for his safety when he noticed that Brown had his hands in his pockets. Therefore, O'Connor asked for permission to pat Brown down and Brown gave consent to a pat down search of his person. 9/22 Tr. 62, 164, 169–170. When Brown gave that consent, he was standing in the doorway. As he said the word "yes," Brown raised his hands over his head and took one step back (a distance of approximately two feet), and backed himself up against the front door which, at the time, was approximately half open (at an angle of approximately 45˜from the door frame). 9/22 Tr. 63–65, 164–65. O'Connor says that he took Brown's conduct as assent to enter the apartment generally, believing that a consent of that scope came from the gesture in which Brown engaged after he was asked whether he could be patted down, in particular, the act of taking one step backward, putting his hands up, and standing against the half-opened door. 9/22 Tr. 62–65.

Thereupon, O'Connor and Shapiro entered the apartment and the following exchange took place between them and Brown:

> Great ... [unintelligible] Is that your car right there? [referring to the Cadillac]
>
> That's not your car?
>
> Whose car is it ... you were driving it a little while ago though right? ... You were driving it tonight?
>
> Whose car is it?
>
> A friend of mine.
>
> A friend of yours? Who is that?
>
> [Unintelligible]

Gov't Ex. 3, p. 3. The tape recording is not actually unintelligible where that word appears on page 3 of the transcript in response to the statement/question "A friend of yours? Who is that?" The tape reflects that, in response to O'Connor's question, Brown called the name "Sumeka" (Plummer), the owner of the car. O'Connor and Shapiro testified that Brown had turned his head around and yelled "police." 9/22 Tr. 41, 66. An examination of the tape recording indicates that no reasonable person could have understood Brown to have called "police." Rather, Brown called "Sumeka" because he thought that the police wanted to talk to her about her car. 9/22 Tr. 174.

Shortly after Brown beckoned Plummer, others came from elsewhere in the apartment into the front room. The police then began to walk around the apartment in an effort to do exactly what O'Connor had set out to do: develop evidence of probable cause to support a search.

While O'Connor and Shapiro roamed the apartment, talking to its occupants, pursuant to the consent supposedly given by Brown, the police found a roll of aluminum foil and a sharp knife on the kitchen table. Gov't Ex. 1. Shapiro opened the door to another room which was occupied by three people. He saw therein "a haze of smoke that smelled like marijuana" as well as a burnt cigar butt in an ashtray and a box of sandwich bags. *Id.*

Armed with the yield of the supposedly consensual search and with the information from the confidential informant,

O'Connor set off to obtain a search warrant, leaving other officers to stay with the occupants of the apartment, all of whom were then in handcuffs. 9/28 Tr. 292. As he was leaving the apartment, O'Connor called back to the other officers and told them to search the car, referring to Plummer's Cadillac which resembled the car described by the confidential informant. Gov't Ex. 3, p. 17; 9/28 Tr. 289.

### 3. The Affidavit In Support Of The February 10 Warrant

The affidavit for the search warrant contains the following information about the entry and the results of the knock and talk technique employed on the evening of February 10:

On 02–10–00, at 2030 this affiant knocked on the door of 2234 Walcott Pl. A short dark complected black male, named Keyon [sic] Brown answered the door. I asked Mr. Brown if that was his car out front, pointing to the Grey Cadillac with tinted windows, and a black ragtop. He stated no. I told him I had just seen him driving it, he said that he had just driven it.

I then asked if I could come inside, and talk. He allowed me to come in. Shortly after, another male came down stairs [sic], upon looking at me; he quickly went into the kitchen. I followed him and observed him sit down by the sink.

On the kitchen table were a role of aluminum foil, and a sharp knife. These are two items used in the packaging of heroin.

Detective Shapiro then asked Mr. Brown who else was in a room. He stated no one. Shapiro opened the door, and observed two adult males and an adult female in the room. There was a haze of smoke that smelled like marijuana smoke. In the ashtray is a burnt cigar butt, that I believe to contain marijuana. There is also a box of sandwich bag [sic] there used to package narcotics. This affiant believes that there are more illegal narcotics inside 2234 Walcott Pl.

Gov't Ex. 1.

Based on this affidavit, the State magistrate issued a warrant to search "the entire residence and curtelage located at 2234 Walcott Place." Gov't Ex. 1. The search was conducted between 10:50 in the evening and for the ensuing several hours. As a result, a number of items were recovered and seized. They included marijuana, heroin, drug paraphernalia, a scale, certain documents, two bullets, some telephones and $10,750 in cash. Gov't Ex. 8.

For the reasons discussed more fully below, it was held, at the conclusion of the first phase of the evidentiary hearing, that the entry into the apartment was not consensual but that there existed, independent of the matters observed during the execution of the knock and talk technique, probable cause for issuance of a search warrant. The probable cause was found in the affidavit submitted by O'Connor in support of the search warrant after excising the references in the affidavit reflecting what was observed during the excursion of the apartment conducted pursuant to the knock and talk procedure.

### B. The Giving Of Johnson's Statement

The parties also have presented evidence respecting the circumstances surrounding the giving of a statement by Iris Johnson who is the lessee of, and resides at, 2234 Walcott Place. Although Johnson was not present when the search occurred on February 10, the circumstances surrounding the giving of Johnson's statement on the next day, February 11, began on the evening of February 10 when Officer O'Connor talked to Johnson's daughter, Iesha Johnson, as O'Connor was departing the residence upon completion of the search.

According to Iesha Johnson, O'Connor told her to inform her mother to come to the police station and to turn herself in. 9/22 Tr. 182. O'Connor also instructed

Iesha to have Iris telephone him and he left his business card so that she could comply with that directive. 9/22 Tr. 185. Iesha's understanding of what O'Connor said was reflected in what Iesha conveyed to her aunt, Tracy Randall, later that evening. Specifically, Iesha told Ms. Randall that O'Connor said that Iris needed to turn herself in at the police station because there was a warrant outstanding for Iris' arrest. 9/22 Tr. 190–91; 9/28 Tr. 373, 382.

Ms. Randall confirmed that: (1) Iesha had so informed her; and (2) she had repeated Iesha's statement to Iris Johnson. 9/22 Tr. 195–96; 9/28 Tr. 373–74, 382. Johnson telephoned O'Connor, and he asked her to come to the RPD and meet him at the lock-up. Iris Johnson complied with those instructions. 9/28 Tr. 337. O'Connor does not recall what he said to Johnson during that conversation or to Iesha on February 10. 9/28 Tr. 247, 374.

However, it is undisputed that O'Connor left his card at Johnson's house with instructions that she was to telephone him. Whatever O'Connor's exact words were, they left the impression in the mind of Iesha Johnson, whose testimony is accepted as credible, that her mother was required to turn herself in at the police department and that there was a warrant for her arrest. Iesha communicated that information to her mother and her aunt. 9/28 Tr. 373–74.

As a result of the information received from Iesha and Ms. Randall, Iris Johnson telephoned O'Connor and was told to report to the lock-up at the police station. She complied with both instructions and, upon arrival at the police station, was taken to an interrogation room near the lock-up area. The room was small, but large enough for a desk and two or three chairs.

Johnson's interrogation by the police was recorded on video and audio tape. Government Exhibit 7 is the video tape and Government Exhibit 4 is a partial transcript of the interrogation. However, as made clear on the record on September 28, parts of the transcript are inconsistent with what actually is recorded on the tape, and, except as cited herein, the transcript cannot be considered accurate. 9/28 Tr. 218–20. However, considering the testimony presented at the hearing, the video tape and certain parts of the audio tape, it is possible to ascertain the circumstances under which Johnson's statement was given.

To begin, the factual record establishes that Johnson went to the police station believing that there was a warrant for her arrest, having been informed that a police officer had stated that it was in her interest to turn herself in, and feeling obligated to do so because that information had been communicated to her. 9/28 Tr. 374. When Johnson arrived at the police station, she was immediately taken to the lock-up area where O'Connor had directed her to meet him. Johnson was then escorted to a small interrogation room nearby. The setting of the interrogation thus emanated an aura of confinement even though Johnson was not in custody.

However, when the interrogation began, the officers informed Johnson that she was not being arrested and, at the early stages of the interrogation, the officers conducted the discussions with Johnson in a reasonably pleasant fashion, sometimes even adopting a jocular tone, thereby underscoring the statement that Johnson was not under arrest and helping to dispel the impression that the small interrogation room near the lock-up was a place of custody. Gov't Ex. 4, p. 1, 6; 9/28 Tr. 374–75, 380.

Three different officers conducted the interrogation. 9/28 Tr. 375. O'Connor remained in the room at all times and Officers Oklesky and McTurner entered and exited the room at various times. During the course of the interrogation, reference was made to Johnson about "once you go out that door" and she was told that the best time for her to talk was in fact "now when she could walk out the door." Gov't Ex. 4, p. 16; 9/28 Tr. 376–77.

The initially jocular and relaxed tone of the interview became more serious as the interview progressed. For example, the police explained to Johnson what had been found in her apartment the evening before and outlined some of the facts of which they were aware respecting the activity being conducted by Bynum at Johnson's apartment. Gov't Ex. 4, pp. 6, 11, 13. And, the officers spoke directly of the nature of Johnson's own predicament as well, explaining that she was facing charges in state and perhaps federal court. Gov't Ex. 4, pp. 13–16; 9/28 Tr. 376–77. They further explained that it would be in Johnson's interest to talk to them and, in so doing, outlined the consequences to her of failing to cooperate, as well as the possible benefits of cooperation in general terms. Gov't Ex. 4, p. 16.

Throughout the interrogation, Johnson appears to have been talking conversationally with the officers and, although she is not well-educated, Johnson's responses to the questions put to her were articulate and evinced that she understood what was being said by the police officers. On occasion, Johnson even disagreed with assertions made by the officers.

That said, the facts also show that Johnson was being interrogated by three officers in a small, windowless room with the door closed. 9/28 Tr. 381. The tone of the questioning was generally civil, but it was direct and, no doubt, its substantive content would create apprehension in any reasonable person. And, it must be borne in mind that this was the interrogation of a person who arrived at the police station believing that there was a warrant for her arrest, having been told to report to lockup, and knowing that the police had searched her apartment under authority of law, the latter fact having been emphasized throughout the interrogation.

On this record, the Court is satisfied that Johnson, although intimidated by the circumstances of her interrogation, nonetheless understood the statements that she was free to leave. 9/28 Tr. 381. During the interrogation, Johnson gave some statements that were inculpatory and some statements that were exculpatory.

For the reasons set forth on the record and outlined below, Johnson's motion to suppress her statement is denied.

## C. The Search of Johnson's Apartment On May 25

On May 25, 2000, Johnson's apartment was again searched, this time by members of a task force constituted by the Drug Enforcement Administration ("DEA"). The search was accomplished pursuant to a warrant issued by a United States Magistrate Judge upon an application and affidavit submitted by a DEA agent. The validity of the search turns on the validity of the warrant which will be discussed in Part III below. For reasons set forth on the record and below, the motions to suppress the yield of the May 25 search are granted.

## DISCUSSION

The issues presented by the defendants' motions are: (a) whether the entry to, and search of, 2234 Walcott Place on February 10 was pursuant to consent; (b) whether, absent consent for entry and after excising the information obtained by the nonconsensual entry, there was probable cause for the issuance of a search warrant on February 10; (c) whether the warrantless search of Plummer's Cadillac on February 10 was authorized under the exigent circumstances exception to the warrant requirement; (d) whether Johnson's statement was voluntary; (e) whether the affidavit in support of the May 25 search was sufficient to support issuance of a search warrant and, if not, whether the good faith exception of *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984) saves an otherwise invalid search; and (f) whether the warrantless search of Plummer's Cadillac on May 25 was authorized under the exigent circumstances exception to the warrant requirement.

Those issues will be addressed seriatim. In so doing, however, it is well to keep in mind certain fundamental principles which are easily, even understandably, forgotten in a society plagued by an epidemic of drug dealing and the violence attendant upon that trade.

As explained by a most respected scholar on the Fourth Amendment, "[t]he essence of the Fourth Amendment has never been better stated than in the oft-quoted dissent of Justice Brandeis in *Olmstead v. United States:*"

> The makers of our Constitution undertook to secure conditions favorable to the pursuit of happiness. They recognized the significance of man's spiritual nature, of his feelings and of his intellect. They knew that only a part of the pain, pleasure and satisfactions of life are to be found in material things. They sought to protect Americans in their beliefs, their thoughts, their emotions and their sensations. They conferred, as against the government, the right to be let alone—the most comprehensive of rights and the right most valued by civilized men.

"Central to the protection of that right is the concept of 'probable cause,' for under the Fourth Amendment the police may not make an arrest or search unless they have probable cause to do so." 2 Wayne R. LaFave, *Search and Seizure, A Treatise on the Fourth Amendment,* § 3.1 at 2 (3rd ed.1996). However, the probable cause requirement of the Fourth Amendment is intended also:

> [T]o give fair leeway for enforcing the law in the community's protection. Because many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for some mistakes on their part. But the mistakes must be those of reasonable men, acting on facts leading sensibly to their conclusions of probability. The rule of probable cause is a practical, nontechnical conception affording the best compromise that has

been found for accommodating these often opposing interests. Requiring more would unduly hamper law enforcement. To allow less would be to leave lawabiding citizens at the mercy of the officers' whim or caprice.

*Brinegar v. United States,* 338 U.S. 160, 176, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949).

These important societal interests are in constant tension, but there are several principles of law that resolve the tension, depending on the facts. Those principles are now to be applied to the facts found above.

## I. The Allegedly Consensual Entry And Search Of Johnson's Apartment On February 10 And The Allegedly Exigent Circumstances Prompting The Search Of Plummer's Vehicle On February 10

### A. The Allegedly Consensual Entry And The Information Obtained Therefrom

 The United States argues that Brown gave consent to enter Johnson's apartment and that, as a result, the information ascertained during the execution of the knock and talk procedure was appropriately used by O'Connor in completing the affidavit upon which the February 10 search was authorized. It, of course, is well-settled that a search pursuant to consent is an exception to the general warrant requirement imposed by the Fourth Amendment. *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Where the consent upon which the United States predicates entry into a residence is subject to challenge, courts are obliged to determine, from the totality of the circumstances, whether there was consent and, if so, whether it was given freely and voluntarily. *United States v. Mendenhall,* 446 U.S. 544, 557, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980); *United States v. Lattimore,* 87 F.3d 647, 650 (4th Cir.1996) (*en banc*); *United States v. Elie,* 111 F.3d 1135, 1144

(4th Cir.1997). In assessing whether consent was freely and voluntarily given and in measuring the totality of the circumstances surrounding the alleged consent, it is appropriate for courts to consider "the characteristics of the accused (such as age, maturity, education, intelligence, and experience) as well as the conditions under which the consent to search was given (such as the officer's conduct; the number of officers present; and the duration, location, and time of the encounter)." *Lattimore*, 87 F.3d at 650 (citations omitted). Of course, consent must be more than mere acquiescence to an apparently lawful authority. *Bumper v. North Carolina*, 391 U.S. 543, 546–47, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968); *Lattimore*, 87 F.3d at 652.

### 1. The Alleged Non–Verbal Consent

Here, the record demonstrates beyond question that Brown gave no express consent for O'Connor and Shapiro to enter the apartment. The United States does not contend otherwise, nor could it because the transcript clearly shows that Brown did not give consent. Instead, the consent is said to be found in the circumstances of a pat down search of Brown after he responded to a request for consent to enter the apartment with the query "why?"

In particular, the United States asserts that consent to enter the apartment is to be found in the action taken by Brown after he was asked by O'Connor "can I pat you down," a question to which Brown answered "yes." At the time of that discussion, Brown was standing in the doorway to the apartment and the door was approximately half-way open, sitting at about a 45° angle to the door frame on Brown's right side as he faced out of the apartment. When Brown responded affirmatively to O'Connor's request to pat him down, Brown took a step back and stood slightly at an angle so that his back was against the door and at the same time raised his hands. Thus, the consent issue presented here is whether the acts taken simultaneously with Brown's verbal consent to a pat down search of his person also constituted consent to entry into the apartment and to walk around therein while talking to Brown.

On occasion, non-verbal consent to searches evinced by gesture has been sustained. For example, in *United States v. Wilson*, 895 F.2d 168, 170 (4th Cir.1990), the Court of Appeals held that the defendant consented to a search of his person by shrugging his shoulders and extending his arms in response to an agent's request to search the defendant. In *United States v. Stewart*, 93 F.3d 189, 192 (5th Cir.1996), the Fifth Circuit explained the rather universal truth that "magic words" (such as "yes") are not necessary to evince consent because "the key inquiry focuses on what the typical reasonable person would have understood by the exchange between the officer and the suspect." And, in the case on which the United States places principal reliance, the Seventh Circuit upheld a finding of consent when, after officers asked to be admitted to the apartment, the co-defendant "stepped back into the apartment, leaving the door partially open," and the officers followed him down a short hallway. *United States v. Griffin*, 530 F.2d 739, 741 (7th Cir.1976). In assessing the district court's finding, the Seventh Circuit underscored the unremarkable concept that "consent may be in the form of words, gesture, or conduct." *Id.* at 742. The First Circuit, in *Robbins v. MacKenzie*, 364 F.2d 45, 47 (1st Cir.1966), held that there was consent where the defendant, after an officer knocked on the door, identified himself as a police officer, and said he wished to talk to the defendant, responded "just a minute," unlocked the door, opened it and then walked back into the room.

Those decisions teach that, in examining the totality of the circumstances to determine whether a reasonable officer would interpret a gesture or conduct as consent, it is necessary to consider the question posed by, and the actions of, the law enforcement officers to which the defendant's

non-verbal conduct was a response. This is illustrated by the decision in *United States v. Shaibu*, 920 F.2d 1423, 1424 (9th Cir.1990), wherein the facts were similar to, but dispositively different than, those presented by *Griffin* and those presented here. In *Shaibu*, the defendant walked out of an apartment into a hallway, the officer identified himself and asked whether a third party was in the apartment, and the defendant walked back into the apartment leaving the door open as officers followed him inside the apartment. The Ninth Circuit distinguished those facts from the facts in *Griffin* because, in *Griffin*, the police had requested entry into the apartment, to which the defendant's conduct (stepping into the apartment and leaving the door open) was a non-verbal affirmative response, whereas, in *Shaibu*, the defendant's actions were in response, not to a request for entry, but to a request to identify someone. *Id.* at 1427. Thus, they could not be reasonably construed to affirmatively evince consent to search.

In *United States v. Gwinn*, 46 F.Supp.2d 479, 484 (S.D.W.Va.1999), *aff'd on different grounds*, 219 F.3d 326 (4th Cir.2000), the district court found dispositive the substance of the law enforcement officer's query in measuring the effect of the defendant's responsive gesture. In *Gwinn*, an occupant did not object to a search of the room in which she was sitting and, at an officer's request, moved from the couch so the officer could retrieve a gun from beneath it. The district court explained:

> The Fourth Circuit cases finding implied consent fall into three general categories: cases in which there was a specific request by police officers and a nonverbal affirmative response by an individual (*Smith* and *Wilson*), cases in which an individual took some affirmative act that directly exposed his or her property to inspection (*Haynie* and *Riley*), and a case in which there was a working relationship between police officers and a cooperating individual (*Williams*).

*Id.* at 484, citing *United States v. Smith*, 30 F.3d 568 (4th Cir.1994); *United States v. Wilson*, 895 F.2d 168 (4th Cir.1990); *United States v. Haynie*, 637 F.2d 227 (4th Cir.1980); *United States v. Riley*, 554 F.2d 1282 (4th Cir.1977); *United States v. Williams*, 106 F.3d 1173 (4th Cir.1997).

The same substantive nexus between query and responsive gesture was remarked upon in *Turner v. State*, 133 Md. App. 192, 754 A.2d 1074, 1082–83 (2000) wherein the court observed that:

> To be sure, the Maryland and Fourth Circuit cases plainly establish that consent to search not only may be express, by words, but also may be implied, by conduct or gesture ... Yet, in all of these cases, the police made it known, either expressly or impliedly, that they wished to enter the defendant's house, or to conduct a search, and within that context, the conduct from which consent was inferred gained meaning as an unambiguous gesture of invitation or cooperation or as an affirmative act to make the premises accessible for entry. By contrast, in those Fourth Circuit cases in which the court concluded that the facts could not support a finding of implied consent, the law enforcement officers either did not ask for permission to enter or search, and thus did not make known their objective, or, if they did, their request was met with no response or one that was nonspecific and ambiguous. (Citation omitted).

■ In this case, when O'Connor asked if he could "come in and talk to you for a second," Brown responded by asking "why," a response that clearly was not consent to enter. Gov't Ex. 3, p. 3. Brown's actions in raising his hands and stepping slightly to his right and back (against the half-open door) were in response to O'Connor's request to search Brown's person, not in response to the request for entry. Just as the act of shrugging shoulders and extending arms in response to a request to search one's person could reasonably be construed as

consent to search the person, as in *Wilson*, a reasonable person would interpret Brown's actions as an affirmative response to the immediately preceding question which sought consent to a pat-down of Brown's person. A reasonable person could not interpret Brown's action of raising his hands and stepping back against the door, in response to the question to pat him down, as consent to enter and walk around the apartment. 9/22 Tr. 170. Therefore, the February 10 entry into the apartment was not consensual.

## 2. The Lack Of Apparent Authority

■ Even if Brown's gesture reasonably could be construed to have been consent (which it could not), the entry and subsequent walk about still would not have been lawful because there was no reasonable basis on which O'Connor could have concluded that Brown had authority to provide a valid consent. Indeed, the United States did not attempt even to establish that O'Connor had such a belief and the record does not show that O'Connor gave the question of Brown's authority over the premises even a passing thought. 9/22 Tr. 172–74.

■ It is settled "that law enforcement officers may [not] always accept a person's invitation to enter premises" because valid consent may be extended only by one with actual or apparent authority to give consent. *Illinois v. Rodriguez,* 497 U.S. 177, 188, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990). Whether Brown had apparent authority to provide consent to enter Johnson's apartment must be determined with reference to an " 'objective standard: would the facts available to the officer at the moment ... "warrant a man of reasonable caution in the belief" ' that the con-

senting party had authority over the premises?" *Id.* (citation omitted). This record contains no fact to suggest that O'Connor had such a reasonable belief. 9/22 Tr. 172–74. And, ignorance of fact is no basis on which to predicate a finding to the contrary.[3]

Indeed, what happened here is that O'Connor wanted to search the apartment; his superior refused permission for personnel reasons and O'Connor decided to use his knock and talk technique to secure entry and, in his words, "develop probable cause." So intent was he on effecting a search that he chose to find consent where none reasonably could be construed to have been given from a person whom he had no reason to believe was authorized to permit a search.[4]

## B. The Search Warrant For The February 10, 2000 Search Of Johnson's Apartment

■ When a district court determines that information obtained from a nonconsensual entry is part of an affidavit that served as the basis of obtaining a search warrant, the court must assess the evidence offered in support of the warrant without considering the information gained from the nonconsensual entry and must decide whether the application for a search warrant contains sufficient information, apart from the tainted information, to establish probable cause. *United States v. Gillenwaters,* 890 F.2d 679, 681–82 (4th Cir.1989); *United States v. Wright,* 991 F.2d 1182, 1186 (4th Cir.1993). This procedure—excising tainted information from a search warrant application and making a probable cause determination—is performed without the deference ordinarily given to a magistrate's finding of probable cause when the search warrant application

---

3. The United States asserts, in passing, that what the officers saw in plain view warranted entry and search even if there was no valid consent. The record provides no factual basis to support application of plain view jurisprudence.

4. In fact, from the testimony given by O'Connor about the knock and talk technique, it is rather obvious that neither he nor others in the RPD who use it concern themselves with apparent authority, much less do they attempt to ascertain whether the person who responds to the knock has authority to permit entry.

contains only untainted information. *United States v. Williams,* 974 F.2d 480, 481 (4th Cir.1992).

■ The probable cause determination, of course, is a practical, common-sense determination of whether, under the totality of the circumstances, "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). The totality of the circumstances involves an inquiry into the confidential informant's veracity or reliability and the basis of his knowledge, *United States v. Wilhelm,* 80 F.3d 116, 119 (4th Cir.1996), and the need to ascertain whether the information was "stale," *United States v. McCall,* 740 F.2d 1331, 1335 (4th Cir.1984).

After excising the information obtained during the illegal search, the application for the February 10 search warrant contains the following statements:[5]

> On 02–10–00 this affiant received information from a Confidential Reliable Informer (CRI) who stated that with in [sic] the last 72 hours of the filing of this affidavit for search warrant that he/she had observed a short dark complicated [sic] black male, nick named "BOO MAN" in the dead end of Walcott Pl. The CRI stated that BOO MAN was dealing heroin in front of his apartment. The CRI stated that BOO MAN lived in, and deals heroin from 2234 Walcott Pl. He/she stated that BOO MAN had heroin on his person, and also hides it in the gas tank of his car. The CRI described the car as a Grey Cadillac with silver tinted windows, and a black ragtop.
>
> The CRI stated that this is an ongoing event. The CRI has been inside the apartment, and observed firearms.
>
> . . .

On 02–10–00, at 2030 this affiant knocked on the door of 2234 Walcott Pl. A short dark complected black male, named Keyon Brown [sic] answered the door. I asked Mr. Brown if that was his car out front, pointing to the Grey Cadillac with tinted windows, and a black ragtop. He stated no. I told him I had just seen him driving it, he said that he had just driven it.

. . .

> This affiant has been a Richmond Police Officer for ten years. I have been assigned to street level drug enforcement for approx. five years, and was assigned to organized crime Narcotics on 5/01/98. I have made numerous arrests for weapons, and narcotics violations with convictions in both state and federal courts. I have attended several narcotics schools. It has been my experience that buyers, and sellers of illegal narcotics routinely hide the drugs in their mouths, underwear, and clothes.
>
> This CRI Has [sic] provided information to the [sic] Richmond Police Dept. for approximately eight years. This CRI Had [sic] given information proven true, and reliable through DMV, and Criminal History Checks, Search warrants, and arrests. The CRI has given information, which lead to the seizure of large quantities of drugs, and guns. This CRI's information has lead to the conviction of several individuals in Va. State, and Federal Courts.

Gov't Ex. 1.

■ The reliability of the confidential informant is established by the final paragraph of the affidavit which shows that: (i) the informant had given information for a period of eight years; (ii) the information had lead to the seizure of guns and drugs and to convictions; and (iii) the information that had proven reliable had been

---

5. The following paragraph of the affidavit has also been excised because the information in it is not linked temporally to February 10 and thus will be regarded as stale. "The CRI stated that he/she has observed in the past a female who lives there selling marijuana from inside the apartment." Gov't Ex. 1; 9/28 Tr. 281. The United States agrees that the information in this paragraph is stale. 9/28 Tr. 278–79.

verified from independent sources such as the Department of Motor Vehicles, criminal history checks, other search warrants and arrests. This showing meets the requirements of reliability under *Wilhelm*, 80 F.3d at 120.

Furthermore, the informant's report was corroborated by an innocent detail which, of course, is one method of ascertaining veracity and reliability of information from an informant. *Wilhelm*, 80 F.3d at 121; *United States v. Lalor*, 996 F.2d 1578, 1581 (4th Cir.1993). Specifically, the affidavit demonstrates that the informant's report of the presence of a gray Cadillac was corroborated by O'Connor's observation of it when he approached the apartment. Considering the corroboration of this innocent detail and the showing of the informant's track record, the affidavit contains a sufficient showing of the reliability of the informant's report, even after excising the information obtained in the nonconsensual walk and talk entry and exploration of Johnson's apartment.

■ The question then becomes whether the remaining reliable information constitutes probable cause to support the February 10 warrant. Probable cause, of course, can be inferred from the circumstances recited in the affidavit and "the nexus between the place to be searched and the items to be seized may be established by the nature of the item and the normal inferences of where one would likely keep such evidence." *United States v. Anderson*, 851 F.2d 727, 729 (4th Cir.1988) (finding warrant to search trailer was not defective when affidavit contained no facts that weapons were located in trailer); *see also United States v. Williams*, 974 F.2d 480, 481–82 (4th Cir.1992) (affidavit establishing defendant was drug dealer and residing at motel sufficient to establish a fair probability that drug paraphernalia would be found in motel room); *United States v. Roberts*, 139 F.3d 895, 1998 WL 165772, *3

(4th Cir.1998) (unpublished) (finding it reasonable to presume instrumentalities of ongoing criminal enterprise (burglary) would be stored in residence).

■ These authorities justify a finding of probable cause here even without the tainted information obtained during the nonconsensual knock and talk technique. For example, the affidavit contains first hand information from the informant that, on February 10, Boo–Man was dealing heroin directly in front of his apartment. And, the informant recites that "this is an ongoing event." The affidavit reflects that "Boo–Man lived in[ ] and deals heroin from" the apartment. It also shows that he kept a supply of heroin on his person and in a nearby car. On this record, it is reasonable to infer that heroin would be in the apartment on February 10 and, given the late hour, Boo–Man could be expected to be there with his mobile stash on his person.

■ Even if the warrant does not specify the informant's basis of knowledge of Boo–Man dealing heroin from within the apartment, "the warrant may still be upheld if the affidavit as a whole demonstrates probable cause." *United States v. Williamson*, 86 F.3d 1154, 1996 WL 293170, *5 (4th Cir.1996) (unpublished), citing *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). However, here the affidavit does contain adequate information outlining the basis of the informant's knowledge. For instance, he or she observed Boo–Man in the dead-end of Walcott Place outside the apartment on February 10 and stated that Boo–Man lived in the apartment, was dealing heroin in front of his apartment, had dealt from the apartment, and that the informant had been in the apartment. These facts show that first-hand knowledge of the information is the basis for the information given.[6] No doubt the basis of the

---

6. The affidavit also states that the informant had observed a female selling marijuana from inside the apartment. While the information

in this paragraph is stale and cannot be considered as support for probable cause that there was heroin in the apartment at that

information could have been more detailed. However, considered as a whole, the affidavit provides enough underlying detail, which, when assessed in perspective of the informant's demonstrated reliability and the corroboration of innocent detail, permitted the magistrate to judge the basis of the information supplied by the informant. Where, as here, there is a strong showing of reliability and veracity of the informant and corroboration of innocent detail, whatever deficiency exists as to the demonstrated basis for the informant's knowledge is insufficient to undercut the reliability of the tip itself. *Gates,* 462 U.S. at 233, 103 S.Ct. 2317.

That Boo–Man keeps some heroin on his person and hides some in the gas tank does not diminish the nexus between the place to be searched and items to be seized because the affidavit does not relate that the only places Boo–Man keeps heroin are on his person and in the gas tank of the car. Given that the affidavit contains information that Boo–Man lived in, and dealt heroin from, his apartment, and that the informant stated this activity was "an ongoing event," it is reasonable to infer that heroin would be found in the apartment on February 10.

 Also, "time is a crucial element of probable cause." *McCall,* 740 F.2d at 1335. Therefore, the facts supporting a search warrant application must not be stale; they must be sufficiently related in time to the· issuance of the warrant to justify a finding of probable cause at that time. *Id.* at 1335–36. When the staleness issue is the currency of the information at the time the warrant was issued (as opposed to at the time it was executed), the court must determine "whether information sufficient to constitute probable cause was ever presented." *Id.* at 1336. In determining staleness, a court does not just count days, but rather looks "to all the

facts and circumstances of the case, including the nature of the unlawful activity alleged, the length of the activity, and the nature of the property to be seized." *Id.* (citation omitted).

In this case, the informant witnessed sales transactions within 72 hours of the preparation of the affidavit. No doubt, a heroin dealer could receive a large shipment of heroin and get rid of it quickly by selling or distributing it. However, the affidavit states that "[Boo–Man's dealing] is an ongoing event" and describes where Boo–Man hides heroin, suggesting that he keeps a supply on hand and nearby his place of dealing which is in, and near, his residence. It is reasonable to infer that a heroin dealer's supply would be replenished if his sales are on-going. Further, the Fourth Circuit has observed that "where no more than seventy-two hours have passed between the alleged drug transaction and issuance of a search warrant, probable cause does not become stale." *United States v. Thompson,* 972 F.2d 344, 1992 WL 182812, *2 (4th Cir. 1992). Accordingly, the informant's information was not stale.

Based on the totality of the circumstances, including the informant's reliability, the currency and level of detail of the informant's information, and the corroboration of innocent detail, it seems rather clear that the affidavit established probable cause even after information from the nonconsensual entry is excised from its text. Therefore, the motions to suppress the yield of the February 10 search pursuant to the warrant are denied.[7]

## C. The Allegedly Exigent Circumstances Prompting The February 10 Search Of Plummer's Vehicle

The officers searched Plummer's car on February 10, 2000 before O'Connor re-

---

time, *see supra* n. 4, it does further corroborate the informant's assertion that he or she had been inside the apartment.

7. The few items found in the apartment after the invalid nonconsensual entry and before the warrant was issued and executed, of course, may not be used in evidence.

turned with the search warrant. 9/28 Tr. 301. The United States argues that exigent circumstances justify the warrantless search because a crowd of roughly 15 people had gathered outside the apartment by the time O'Connor left to obtain a warrant. 9/28 Tr. 292. To that base, it must be added that, at least three officers were at the apartment when O'Connor left, and eight eventually came to the apartment before, or shortly after, he returned with the warrant. 9/28 Tr. 291. The officers had possession of the keys to the Cadillac. 9/28 Tr. 310. While O'Connor was obtaining the warrant, the occupants of the apartment were in handcuffs. 9/28 Tr. 292. And, it must be remembered that O'Connor gave the instruction to search the car as he left the apartment and before he knew of the group assembled outside. Finally, it is important to note that no witness testified that the group assembled outside was near the car much less that anyone had approached it. On this record depends the claim of entitlement to search under the exigent circumstances exception to the warrant requirement of the Fourth Amendment.

■ To qualify a search under the exigent circumstances exception to the warrant requirement, the United States must prove that officers have probable cause to believe contraband is present and reasonably believe that the evidence may be removed or destroyed before they can obtain a warrant. *United States v. Turner*, 650 F.2d 526, 528 (4th Cir.1981); *United States v. Taylor*, 90 F.3d 903, 909 (4th Cir.1996). This determination is to be made from the perspective of "what an objective officer could reasonably believe." *United States v. Grissett*, 925 F.2d 776, 778 (4th Cir.1991). And, as always, it is important to credit the experience and knowledge of the police officer.

■ The officers here had probable cause to determine that contraband was present in the car based on information provided by the confidential informant. 9/28 Tr. 308. The factors used to ascertain the existence of exigent circumstances include: "(1) the degree of urgency involved and the amount of time necessary to obtain a warrant; (2) the officers' reasonable belief that the contraband is about to be removed or destroyed; (3) the possibility of danger to police guarding the site; (4) information indicating the possessors of the contraband are aware the police are on their trail; and (5) the ready destructibility of the contraband." *Turner*, 650 F.2d at 528 (citation omitted).

■ Here, the record establishes that the time expected to obtain a warrant was approximately an hour.[8] Thus, the first factor indicates slight urgency. Factors 2 through 4 are not at issue, and no one contends otherwise. Only the fifth of the five factors bearing on this determination, the ready destructibility of the contraband, is presented as justification for the search of Plummer's car on February 10. *Grissett*, 925 F.2d at 778 (drugs as "easily disposable" substances). Without doubt, the contraband was readily destructible by its nature. There is no evidence, however, that anyone in the group outside the apartment had access to the car, knowledge of its contents, or likely was to remove or destroy contraband. No reasonable officer could have believed that any contraband in the car was likely to have been removed or destroyed before O'Connor could return with a search warrant, and there is no basis in the record to conclude that any officer did so believe. 9/28 Tr. 310–11. There is no evidence to suggest that searching the car was necessary to protect the safety of the officers. 9/28 Tr. 310. Indeed, the suspected possessors of the contraband in the car were in handcuffs, and nothing suggests that the people outside presented any threat. *Id.* There being no exigent circumstances to permit the

---

8. The transcript of the tape made during the knock and talk indicates O'Connor approached the apartment at around 8:30 PM and returned with the warrant around 10:50 PM; the magistrate dated the warrant 02–10–00 10:20 PM. Gov't Ex. 1; Gov't Ex. 3.

warrantless February 10 search of Plummer's car, her motion to suppress the yield of the February 10 car search is granted.

## II. Johnson's February 11 Statement

Based on testimony at the hearing, it is established factually that Johnson went to the police station on February 11 with the understanding that there was an outstanding warrant for her arrest and that it was in her interest to go to the police station because O'Connor had left both messages to be delivered to Johnson expecting her to be influenced by them. 9/28 Tr. 374. O'Connor told her to meet him at the lockup and she complied. However, when Johnson met O'Connor at the lockup, before entering the small, windowless room in which she spoke to the detectives, O'Connor told her he was not going to "lock [her] up" that day and that he just wanted to talk to her. 9/28 Tr. 338. Johnson understood that statement to mean that O'Connor would lock her up eventually, but not necessarily that day. 9/28 Tr. 339.

Early in the conversation, Oklesky told Johnson that she was not being arrested and that the officer wanted to chat. He also asked whether there was anywhere Johnson needed to be that evening. 9/28 Tr. 343; Gov't Ex. 4 at 1. The tone the detectives used in the conversation was reasonably pleasant and did not appear to intimidate Johnson. 9/28 Tr. 374–75. The detectives made several references to the February 10 search. Gov't Ex. 4 at 6, 8; 9/28 Tr. 375. The detectives were seeking Johnson's cooperation and told her so; indeed one of the detectives told Johnson they were offering her a lifeline instead of arrest. Gov't Ex. 4 at 6; 9/28 Tr. 375.

At one point, after stating that Bynum was placing the safety of Johnson and her family in jeopardy, a detective said, "You don't have to tell me today, if today is not the day to speak, that's fine ... if you need a couple of days to think about that, that's fine." Gov't Ex. 4 at 15; 9/28 Tr. 376. After making statements about the desire of the United States Attorney to "indict as many people as possible," a detective said to Johnson, "we don't expect you to give everything up the first day that you sit down with us, but you have to think about this, once you go out that door ..." Gov't Ex. 4 at 16; 9/28 Tr. 377. These statements illustrate the fact that Johnson, who clearly was apprehensive about her predicament and who was somewhat intimidated by the circumstances, would have been able to cease talking to the detectives and leave. At the end of the conversation, Johnson did leave the station and was not arrested.

■ Johnson was not placed under arrest on February 11 and was not given *Miranda* warnings. 9/28 Tr. 226, 341, 378. Of course, if she was in a custodial interrogation, Johnson should have received *Miranda* warnings because "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way" must be preceded by those warnings. *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *see also Dickerson v. United States,* 530 U.S. 428, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000). The "ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler,* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983) (citation omitted). That determination is made under a "totality of the circumstances" test. *United States v. Howard,* 115 F.3d 1151, 1154 (4th Cir. 1997).

■ The essential issue in this assessment is whether "a reasonable person in [Johnson's] position would have understood that [she] was in custody." *Id.* In making this determination:

[N]either the location nor the purpose of the interview is dispositive of whether a suspect is in custody. The fact that the questioning takes place at a police sta-

tion is not by itself enough to establish custody so long as the individual being interviewed would perceive that his freedom of movement was not constrained to a degree associated with arrest ... The [Supreme] Court has further held that even a clear statement by an officer that the person being questioned is a suspect does not alone determine custody, but is only "one among many factors" that bear on an assessment of whether a reasonable person would feel free to depart ... The Court has held, in fact, that Miranda warnings are not required when a suspect voluntarily accompanies police to the station, answers questions, and then is allowed to leave.

*Id.* at 1155 (citations omitted). Thus, the fact that Johnson was questioned at the police station is not dispositive of whether the interrogation was custodial, thereby necessitating *Miranda* warnings.

Although Johnson arrived at the police station with the understanding that there was a warrant for her arrest, the detectives thereafter made clear, before and during her conversation with them, that she was free to leave and was not obligated to speak to them. Johnson was not placed under arrest. Her freedom of movement was not constrained; she was told that she was not being arrested and at least twice during the conversation, the police officers told Johnson that she could walk out the door. On this record, it is clear that Johnson was not subjected to custodial interrogation on February 11. 9/28 Tr. 379–380.

■ Johnson also argues that her statement was not voluntary under the Fifth Amendment, which guarantees that "[n]o person ... shall be compelled in any criminal case to be a witness against himself ... without due process of law." U.S. Const.Amend. V. *See also United States v. Braxton,* 112 F.3d 777, 780 (1997). "A statement is involuntary under the Fifth Amendment only if it is 'involuntary' within the meaning of the Due Process Clause." *Braxton,* 112 F.3d at 780, citing

*Oregon v. Elstad,* 470 U.S. 298, 304, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985). Whether a statement is voluntary under the Due Process Clause is determined by "whether the confession was extracted by any sort of threats or violence, [or] obtained by any direct or implied promises, however slight, [or] by the exertion of any improper influence." *Id.* (internal quotations omitted).

■ However, "[t]he mere existence of threats, violence, implied promises, improper influence, or other coercive police activity ... does not automatically render a confession involuntary. The proper inquiry, therefore, 'is whether the defendant's will has been "overborne" or his "capacity for self-determination critically impaired." ' " *Id.* (citation omitted). The United States bears the burden of proving by a preponderance of the evidence that the statement was voluntary. *Id.* at 781.

"To determine whether a defendant's will has been overborne or his capacity for self-determination critically impaired, courts must consider 'the "totality of the circumstances," including the characteristics of the defendant, the setting of the interview, and the details of the interrogation.' " *Id.* (citation omitted).

Johnson is an articulate woman and a responsible, working mother who supports five children. Although the officers twice employed the tactic of making reference to Johnson's children and the risks to their safety, Gov't Ex. 4 at 13, 15, she appeared not to be influenced by these references. The interview took place at a police station in a closed room with as many as three officers conducting the inquiry. The detectives were civil to Johnson and did not raise their voices. 9/28 Tr. 383–84. Details of the interrogation show that Johnson thought it was in her interest to talk to them. 9/28 Tr. 384. In fact, much of Johnson's statement was exculpatory. 9/28 Tr. 368, 369, 384. Johnson testified that no threats were made to her and the videotape of the interview confirms that

fact. 9/28 Tr. 350; Gov't Ex. 7. The police officers clearly made statements, of perhaps doubtful propriety, about the aggressive tactics of the United States in seeking indictments, but the tone in which these statements were made, convince that they did not amount to threats. Gov't Ex. 4 at 16; 9/28 Tr. 384. The detectives sought Johnson's cooperation and told her that early cooperation would give her the most benefit, but they did not make promises of leniency, even though their statements were directed to that suggestive end.

On this record, the United States has established by a preponderance of the evidence that under the totality of circumstances, Johnson's will was not overborne (even though Johnson was somewhat intimidated by the circumstances of her interrogation) and that the statement she made on February 11 was given voluntarily. Therefore, Johnson's motion to suppress her February 11 statement is denied.

### III. The May 25 Search Of 2234 Walcott Place

#### A. Probable Cause for the May 25 Search Warrant

On May 25, 2000, three and one half months after the search of 2234 Walcott Place on February 10, there was another search of that residence. This one was authorized by a warrant issued by a United States Magistrate Judge on the basis of an affidavit submitted by a DEA agent.[9] The search produced a firearm, some ammunition and a small quantity of marijuana.

The affidavit contained seven paragraphs thought by the agent to present probable cause. The pertinent part of the affidavit provides:

3. This affidavit is made in support of a SEARCH WARRANT for the residence of Terrell BYNUM, located at 2234 Walcott Place, Richmond, VA. This location has been utilized by BYNUM in furtherance of drug trafficking crimes and is within the Eastern District of Virginia and the jurisdiction of the Court.

4. BYNUM is described by the Virginia Department of Motor Vehicles as a male with a date of birth of 01/01/79 and social security number 227–43–1409. BYNUM has a criminal record in Virginia and is a convicted felon.

5. Information and intelligence provided in this investigation by a Confidential Source (CS) has been proven reliable and information provided to law enforcement has been verified. The CS has identified BYNUM as a large quantity dealer of heroin.

6. On February 10, 2000, a search warrant conducted at 2234 Walcott Place, Richmond, VA by DEA and the Richmond Police Department resulted in the seizure of approximately 196 gross grams of heroin. $10,750 in U.S. Currency was also seized from within the residence. Additionally, a digital scale, razor blade and packaging material were seized from the residence.

7. Within the past 72 hours, the CS has observed a large quantity of heroin within the residence at 2234 Walcott Place, Richmond, VA. The CS observed BYNUM packaging heroin for distribution and delivering a portion of the narcotics to three associates. A substantial amount of heroin remained within the residence after the delivery.

Gov't Ex. 2.

The first two paragraphs are boilerplate text reciting the affiant's background, training and general knowledge about the drug trade. Neither paragraph 1 nor paragraph 2, however, is pertinent to the ascertainment of probable cause because nothing in the remainder of the affidavit is

---

9. No information used to secure issuance of the May 25 search warrant affidavit was obtained from the February 10 nonconsensual entry, so under *Gillenwaters*, 890 F.2d at 681–82 and *Wright*, 991 F.2d at 1186, no part of the affidavit need be excised. 9/22 Tr. 322.

based on the affiant's personal background, training or familiarity with the drug trade.

Paragraph 3 recites that the place to be searched was Bynum's residence and that it "has been utilized by BYNUM in furtherance of drug trafficking crimes." The fourth paragraph gives Bynum's birth date and social security number and states that he has a "criminal record in Virginia and is a convicted felon."

Paragraph 6 recites the fact of the February 10 search and informs that the search yielded approximately 196 grams of heroin, $10,750, a digital scale, razor blade and packaging material. Paragraph 6 supplies a time frame for the otherwise unspecified past use of the residence in the "furtherance of drug trafficking crimes" recited in Paragraph 3, and this is duplicative of paragraph 3 to that extent. And, Paragraph 6 confirms the conclusory statement about the use of the residence by giving factual details consistent with the assertion (*e.g.* the yield of the February 10 search). However, taken together the text of paragraphs 3, 4 and 6 do not supply probable cause for a search of 2234 Walcott Place on May 25, and the United States does not argue otherwise.

Instead, the basis for a search on May 25 is said, by the United States, to depend on information given by an unidentified informant whose provenance is found in paragraph 5 of the affidavit which, in full text, informs that:

Information and intelligence provided in this investigation by a Confidential Source (CS) has been proven reliable and information provided to law enforcement has been verified. The CS has identified BYNUM as a large quantity dealer of heroin.

Gov't Ex. 2. Notably, neither in paragraph 5 nor elsewhere in the affidavit is there any proof that the informant is credible or reliable nor does the affidavit reflect what "information and intelligence" provided by this informant in the past have proved reliable or have been verified.

And significantly, the informant is not linked at all to the assertion in paragraph 3 that the "location has been utilized by BYNUM in furtherance of drug trafficking crimes" nor is the informant identified as having provided information in support of the February 10 search. The absence of that sort of linkage of the informant to the events of February 10 or the events set out in paragraph 3 is important because it rather obviously indicates that the informant was not the source of those potential indicia of reliability and veracity. Otherwise, one would expect the affiant to have provided this obvious indicia of the informant's reliability and veracity, if it existed.

Hence, as to the informant for the May 25 affidavit, the issuing officer knew only of the affiant's conclusory and unsupported opinion that the informant had provided some sort of unspecified "intelligence and information" at some point during the investigation and that, in the affiant's opinion (for which no basis at all is supplied), the unspecified "intelligence and information" is reliable and verified.

Paragraph 7 recounts the information supplied by the informant. It says:

Within the past 72 hours, the CS has observed a large quantity of heroin within the residence at 2234 Walcott Place, Richmond, VA. The CS observed BYNUM packaging heroin for distribution and delivering a portion of the narcotics to three associates. A substantial amount of heroin remained within the residence after the delivery.

Gov't Ex. 2. Paragraph 7 indicates that the informant's knowledge was based on personal observation but it does not provide any "underlying factual circumstances to support the informant's knowledge," a settled requirement to support probable cause. *United States v. Weaver,* 99 F.3d 1372, 1378 (6th Cir.1996).

If the informant had been shown to be credible and his information had been shown to have been reliable, the text of

paragraph 7 would have been sufficient to supply probable cause because it shows personal observation as the basis for the information and the information itself makes it reasonable to believe that heroin likely remains in the place to be searched. (*See* authorities cited pp. 785–87, *supra.*)

Probable cause is a "practical, nontechnical conception." *Brinegar v. United States,* 338 U.S. 160, 176, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949). And, as the Supreme Court made clear in *Brinegar:*

> In dealing with probable cause, ... as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.

*Id.* at 175, 69 S.Ct. 1302. Thus, "probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Gates,* 462 U.S. at 232, 103 S.Ct. 2317.

The controlling test for assessing the sufficiency of the basis for issuing a search warrant is set forth in *Illinois v. Gates,* wherein the Court explained that:

> The task of the issuing magistrate is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a "substantial basis for ... conclud[ing]" that probable cause existed.

*Id.* at 238–39, 103 S.Ct. 2317.

The existence of probable cause is to be measured under the totality of the circumstances test outlined in *Illinois v. Gates.* Therefore, the veracity, reliability and basis of knowledge of an informant "are all highly relevant in determining the value of his report[,]" but those elements "should be understood simply as closely intertwined issues that may usefully illuminate the commonsense, practical question whether there is 'probable cause' to believe that contraband or evidence is located in a particular place." *Id.* at 230, 103 S.Ct. 2317.

Before applying the rule of *Illinois v. Gates* to the facts of this case, it is helpful to recall that, in *Gates,* the Supreme Court of the United States "abandon[ed] the 'two-pronged test' established by [its] decisions in *Aguilar* [378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964) ] and *Spinelli* [393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969) ]." *Id.* at 238, 103 S.Ct. 2317. In *Gates,* the Supreme Court explained that a two-pronged test was not really what it had intended in those decisions (*Gates,* 462 U.S. at 231 n. 6, 103 S.Ct. 2317) and concluded that such a test served to unreasonably straightjacket the efforts of law enforcement officers.

■ Nonetheless, it is clear that, in abandoning the two-pronged test which had arisen as a result of *Aguilar* and *Spinelli,* the Supreme Court, in *Illinois v. Gates,* did not abandon previous jurisprudence respecting the importance of informing the issuing magistrate about the veracity and reliability of the informant and the basis of the information that he had provided. Rather, the Court merely held that the veracity and reliability of the informant and the basis of his knowledge did not have independent status apart from the rest of the information made known to the magistrate, commenting that:

> Instead they [veracity or reliability or the informant and his basis of knowledge] are better understood as relevant considerations in the totality of circumstances analysis that traditionally has guided probable cause determinations: a deficiency in one may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the

other, or by some other indicia of reliability.

*Gates,* 462 U.S. at 233, 103 S.Ct. 2317.[10]

It is thus appropriate to remember what must be shown about the reliability or veracity of the informant. It is fundamental that the affidavit must contain, *inter alia,* "some of the underlying circumstances from which the officer concluded that the informant ... was 'credible' or his information 'reliable.'" *Aguilar,* 378 U.S. at 114, 84 S.Ct. 1509. And it remains settled that the magistrate must be offered reasons to support a conclusion in an affidavit that the informant was "reliable." *Spinelli,* 393 U.S. at 416, 89 S.Ct. 584. Or, as put by Justice White in his concurring opinion in *Spinelli,* "[t]he unsupported assertion or belief of the officer does not satisfy the requirement of probable cause." *Id.* at 423, 89 S.Ct. 584 (White, J., concurring). And, as a leading commentator has observed:

> Though the Supreme Court in *Illinois v. Gates,* abandoned the two-pronged test of *Aguilar–Spinelli* in favor of what appears to be a less demanding probable cause concept, this should not be taken as casting any doubt upon the proposition that conclusory allegations about the informant's past performance will not suffice. As the *Gates* majority explained, citing *Aguilar* in support: "an officer statement that 'affiants have received reliable information from a credible person and believe that heroin is stored in a home, is likewise inadequate.'"

2 LaFave, *Search and Seizure, A Treatise On The Fourth Amendment,* § 3.3(b) at 105. Thus, it is generally accepted that credibility and reliability of the informant can be shown by offering "a declaration that the informant's past information has led to convictions." *Id.* Likewise, credibility can be demonstrated by informing the magistrate judge of the successful use of the informant on previous occasions. *Id.* Of course, an informant's story may be verified as reliable if he has made an admission against his penal interest. *United States v. Harris,* 403 U.S. 573, 583–84, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971). Reliability may be shown by the presence in the informant's report of self-verifying detailed information. 2 LaFave, *Search and Seizure, A Treatise On The Fourth Amendment,* § 3.3(e). These are but a few ways in which the reliability and veracity of the informant may be shown. But, from those decisions, what remains fundamental and beyond question is that there must be a demonstration of the reliability or veracity of the informant.[11]

The importance of the reliability of the informant is reflected in the recent decision of the United States Court of Appeals for the Fourth Circuit in *United States v. Wilhelm,* 80 F.3d 116 (4th Cir.1996). *Wilhelm,* of course, was decided after the decision in *Gates* and applied the totality of the circumstances test. In *Wilhelm,* the Fourth Circuit considered an affidavit far

---

**10.** This formulation of the test to be applied has been severely criticized and characterized as a flawed one by one of the nation's most respected commentators. 2 LaFave, *Search and Seizure, A Treatise On The Fourth Amendment,* § 3.3(a) at 98–103. A number of other commentators likewise have criticized the *Gates* formulation and a number of states have declined to follow that formulation in the application of state court equivalence to the Fourth Amendment. *Id.* However, much of the criticism has to do with the extent to which *Illinois v. Gates* illuminates the requirement for a showing of the veracity or reliability or basis of knowledge of the informant. Subsequent cases in the United States Court of Appeals for the Fourth Circuit, and indeed in other courts, have shown that this apprehension is unfounded.

**11.** There is no retrenchment from the insistence on indicia of reliability for information provided by the tips of unidentified informants. Indeed, in the context of a Terry stop, the Supreme Court recently has underscored the importance of demonstrating reliability on the part of the informant when the anonymous tip of an informant is used to invade the protections of citizens under the Fourth Amendment. *Florida v. J.L.,* 529 U.S. 266, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000).

more detailed that the one involved here and concluded that the absence of information about the truthfulness and reliability of the informant foreclosed a finding of probable cause. *Id.* at 120.

■ Applying the fundamental precepts of *Gates* and *Wilhelm,* as informed by the established jurisprudence respecting the need to prove the reliability or veracity of an informant, to the facts of the affidavit presented here requires the conclusion that the affidavit is defective because it provides no information whatsoever, other than the conclusory statement of the affiant, respecting the reliability and veracity of the informant.

Obviously aware of this defect in the warrant, the United States asserted at oral argument[12] that the information reflected in paragraph 6 about the search conducted on February 10 is sufficient, in context of the other assertions in the affidavit, to establish probable cause.

First, the United States argued that the fact of the February 10 search and the yield of that search tends to confirm the veracity and reliability of the informant. That contention is flawed because nothing links the informant with the February 10 information. Therefore, it cannot be used to supply proof of his veracity or credibility, as could have been done had the affidavit shown that the informant had provided the information on which the February 10 search was based.

Second, the United States contends that the fact that heroin, money and drug paraphernalia had been found in the residence on February 10 confirms the report of the heroin in the residence on May 25, some three and a half months later, as reported on the basis of the informant's personal observation. This argument must be as-

sisted in perspective of the teachings in *Gates* and *Brinegar* that probable cause is a common sense concept depending upon the particular factual context and upon probability in perspective of the factual and practical considerations of every day life on which reasonable people act.

It is not reasonable to believe that merely because heroin, money and drug paraphernalia were seized from a place three months previously, that an unidentified, unvouched for informant is providing correct information about the current situation at that same place. Indeed, it is illogical to assume that a drug dealer would continue to conduct business in the same location from which a sizeable amount of product and currency had been seized earlier. A reasonable person would not expect a drug dealer, (particularly the savvy one that Bynum is described to be in the affidavit) to engage in activities of the type described in paragraph 7 when the drug dealer reasonably might expect the police to be watching the site of a previous highly productive search and seizure. Therefore, it is especially important that the magistrate judge be informed why it would be reasonable to expect such an unreasonable circumstance should be expected to exist.

Personal knowledge on the part of an informant would be quite helpful in so informing the magistrate judge if the basis for it were given and if it were shown that the informant were in fact reliable and how his information had been verified. Those showings could be made by any number of means that are well-understood by informed law enforcement officers, and some of those means have been outlined in the foregoing discussion. Unfortunately, none of them were used here.

---

12. The pleadings of the United States addressed to this issue were stricken because they were untimely filed notwithstanding a clear deadline established by Court Order. This failure deprived the counsel for the defendants and the Court of the opportunity adequately to prepare for the positions taken by the Government in its response pleading. Nor was this the first occasion on which the United States had been dilatory in filing the necessary information. Accordingly, the Court considered only the arguments of the United States made at the oral argument.

The United States also has argued that this matter is a close call and therefore the magistrate judge had a substantial basis for concluding that the heroin would be in the location. However, the United States does not explain how this issue is a close call or how, even if that is true, it warrants a finding that there is a substantial basis for concluding that heroin would be at 2234 Walcott Place on May 25. Given that it defies logic and reason to expect someone to expose himself, his product and his resources to yet another invasion by law enforcement officers, it cannot be said that there existed a substantial basis for the issuance of the May 25 warrant.[13]

What is more, unlike the affidavit of February 10, there was not a strong showing as to the basis for the informant's knowledge which is found in the conclusory, boilerplate observation that the informant had observed Bynum packaging and delivering heroin at an unspecified location, at an unspecified time. That conclusory recitation is without underlying detail; and thus is insufficient to show the basis of the informant's information. *Weaver*, 99 F.3d at 1377–78. Not only did the affidavit provide no underlying detail (such as the location, or the date), but also it was lacking in a showing of corroboration of innocent detail as well as devoid of proof of the informant's veracity and reliability. Hence, this affidavit lacks any demonstration of the veracity or reliability of the informant or the basis for his information. It thus lacks what has been settled since *Gates*, if not before, as essential components (in some combination) of a constitutionally sufficient probable cause showing.

In sum, this affidavit is lacking all three predicate showings which permit reliance on an informant's statement. Hence, the information in paragraphs 7 and 5 will not support the warrant. And, the contents of paragraph 6 are so remote in time as to be the basis, standing alone, for a finding of probable cause. Thus, in the probable cause calculus, paragraphs 7 and 5 are zero and paragraph 6[14] is zero as well. And, zero plus zero is zero. But, even if paragraph 6 could be accorded a value greater than zero, it is too disconnected, temporally (three months) and logically, to the informant's report of May 25 to permit a finding of probable cause.

## B. Good Faith Reliance On The May 25 Search Warrant

 Finally, the United States argues that good faith reliance by law enforcement on the search warrant, an exception to the warrant requirement, saves the yield of the May 25 search from suppression. *See United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984); *United States v. Clutchette*, 24 F.3d 577 (4th Cir.1994). Good faith reliance, of course, must be objectively reasonable. *Leon*, 468 U.S. at 919–920, 104 S.Ct. 3405; *United States v. George*, 971 F.2d 1113, 1123 (4th Cir.1992). The good faith exception to the warrant requirement does not apply in four situations: (1) the warrant is based on an affidavit containing knowing or reckless falsity; (2) the magistrate acted as a rubber stamp for the police; (3) the affidavit does not provide a substantial basis for determining the existence of probable cause; or (4) an officer could not reasonably rely on the warrant because it is so facially deficient. *Leon*, 468 U.S. at 923, 104 S.Ct. 3405; *Clutchette*, 24 F.3d at 581; *Wilhelm*, 80 F.3d at 121.

As the United States argues, the Fourth Circuit has held that the good faith exception can, in some circumstances, save a warrant lacking in verification of an informant's reliability. *See United States v.*

---

**13.** And, although the analysis of probable cause does not depend upon the yield of the search, it is interesting to note that when the search warrant was executed on May 25, no heroin was found. The May 25 search yield-ed a firearm, some ammunition and some marijuana.

**14.** Paragraph 3 does not alter the analysis.

*Edwards*, 798 F.2d 686 (4th Cir.1986).[15] In *Edwards*, the officers admittedly had not used the informant before, and the affidavit lacked information about the informant to protect the informant's safety. The officers had tips from two informants that corroborated each other and were corroborated by investigation of an innocent detail concerning a rental car. The Fourth Circuit held that the officer's reliance was reasonable for the following reasons: the officer had seen an eyewitness come out of the residence; the officer had spoken to another informant, who told him a story consistent with the eyewitness; and the officer knew that the magistrate previously received information from another officer and, based on it, had said they were close to establishing probable cause. *Id.* at 691.

■ *Edwards* is distinguished from this case in two respects. First, the magistrate authorizing the warrant in *Edwards* had information which was not contained in the affidavit that corroborated information from the informant. For example, the magistrate there knew that the officer had seen an informant come out of the house in question. In this case, the United States did not present evidence that the officer seeking the warrant presented any information that is not contained in the affidavit to the magistrate. Second, in *Edwards*, the magistrate, rather than the officer, wrote the affidavit. In this case, an officer wrote the affidavit and presented it, and no other information, to the magistrate.

Subsequent to *Edwards*, the Fourth Circuit has held that the good faith exception does not apply to warrants supported by a "bare bones" affidavit, such as an affidavit containing conclusory statements about an informant's reliability and little corroboration. *Wilhelm*, 80 F.3d at 121. The Fourth Circuit explained that any affidavit less informative than that of *Edwards* would not be entitled to a good faith exception. *Id.* at 123; *United States v. King*, 155 F.3d 562, 1998 WL 390961, *4 (4th Cir.1998) (unpublished). In this case, the affidavit is less detailed than in *Edwards*; the *Edwards* affidavit contained a description, including make, model, color, and license plate number of a car and a precise time at which the drugs would be moved. *Edwards*, 798 F.2d at 688. The affidavit here is less substantial than the one described in *Wilhelm* to be "bare bones" and thus deficient. The affidavit on which the May 25 search was authorized is so facially deficient, containing no statement of the informant's reliability and no corroboration, that reliance on it cannot receive the good faith exception.

As explained above (Part A *supra*), the affidavit submitted by the DEA agent does not provide a substantial basis for a finding of probable cause because it is " 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.' " *Leon*, 468 U.S. at 923, 104 S.Ct. 3405 (quoting *Brown v. Illinois*, 422 U.S. 590, 610–11, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975) (Powell, J. concurring in part) and citing *Illinois v. Gates*, 462

15. In *Edwards*, a mother, the first informant, related to an officer that her son, who had quit school and left home, was in a house that she had driven to see. The mother saw lots of plants being moved in and out of the house. She said that there were drugs in the house and the occupant of the house had rented a car and was planning to leave for Mexico the following day at 4:00 AM to buy drugs. When this officer relayed the information from the mother to the magistrate, the magistrate told him that he was "real close" to establishing probable cause. Meanwhile, another officer spoke with the mother, who had been back to the house. This time, she spoke with her son, who told her that he was going to Mexico in the morning and evaded a question about the type of plants that were at the house. This officer went to the house and spoke with the second informant, who the officer observed come out of the house. The second informant identified himself as the first informant's son and identified the location and quantity of drugs in the house. The second officer also confirmed that a car in the driveway was a rental car. When the second officer went to the magistrate with information from the second informant and the rental car, the magistrate typed an affidavit which the second officer signed.

U.S. at 263–64, 103 S.Ct. 2317 (White, J. concurring in the judgment)). Thus, it is not entitled to the good faith exception of *Leon. Id.*

▮ The good faith determination is based on objective reasonableness and, in the fact scenario presented here, the time for measuring reasonableness is "as of the time of warrant application and thus without consideration of the fact that the magistrate thereafter acted favorably upon the affidavit presented." 1 LaFave, *Search and Seizure, A Treatise on the Fourth Amendment,* § 1.3(f) at 90, citing *Malley v. Briggs,* 475 U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). The reasonable officer, as of May 25, 2000, knew or should know that the magistrate judge must be presented with information sufficient to assess independently the veracity and reliability of the informant as well as the basis for his information. And, the reasonable officer would know that conclusory averments on those points are insufficient to supply probable cause. And, a reasonable officer would certainly know that information from a search three months in the past would not suffice either. Nor could a reasonable officer believe that the three month old information could be brought to life by the bare bones statement of an informant whose provenance was not in an affidavit which contained no underlying facts about the basis for the informant's information.

To apply the good faith exception here would allow the exception to swallow the basic rules of probable cause and the exclusionary rule. If an officer can claim good faith successfully here, it is difficult to envision any flawed affidavit that would yield to the exclusionary rule.

Even in a society beset with drug trafficking, the rules must apply. Here it would have been simply to supply enough information to have: (a) shown the veracity and reliability of the informant; (b) shown the facts underlying the basis for his information; and (c) even to have linked the events of February 10 with those of May 25. The failure to do so cannot be excused as to these basic requirements. And, to insist upon them will not straightjacket law enforcement in the least.

## C. The May 25 Search Of Plummer's Car

The May 25 search warrant does not authorize the search of the Cadillac and the affidavit in support of the warrant contains no references to the car. Gov't Ex. 2. The yield of the May 25 car search must be suppressed unless it is saved by the exigent circumstances exception. The United States conceded that circumstances surrounding the May 25 car search were not substantially different from February 10. ⅔ Tr. 314. Accordingly, the Court finds that exigent circumstances did not permit the May 25 car search. *Turner,* 650 F.2d at 528; *Taylor,* 90 F.3d at 909; *Grissett,* 925 F.2d at 778. Plummer's motion to suppress the yield of the May 25 car search is granted.

## CONCLUSION

For the foregoing reasons, the motions to suppress are: (a) granted as to the yield of the nonconsensual entry into 2234 Walcott Place on February 10; (b) denied as to the yield of the February 10 search of 2234 Walcott Place pursuant to search warrant; (c) granted as to the warrantless search of Plummer's Cadillac on February 10; (d) denied as to Johnson's February 11 statement; (e) granted as to the May 25 search of 2234 Walcott Place; and (f) granted as to the warrantless search of Plummer's Cadillac on May 25.

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record.

It is so ORDERED.