782 A.2d 862

**Aaron A. SCOTT**

**v.**

**STATE of Maryland.**

**No. 143, Sept. Term, 2000.**

Court of Appeals of Maryland.

Oct. 11, 2001.

122

Nancy S. Forster, Asst. Public Defender (Stephen E. Harris, Public Defender, on brief), Baltimore, for appellant.

Gary E. Bair, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. of Maryland, and Michelle W. Cole, Staff Atty., on brief), Baltimore, for appellee.

Argued Before BELL, C.J., and ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL, and BATTAGLIA, JJ.

WILNER, Judge.

Before us, for the first time, is the validity of a motel room search pursuant to a police technique called "knock and talk"—a technique that, in recent years, has become quite popular with police agencies around the country. The courts, on the whole, have sustained it. Petitioner, Aaron Scott, who, as a direct result of such a search, was convicted in the Circuit Court for Baltimore County of possession with intent to distribute cocaine and, as a repeat offender, sentenced to a prison term of 10 years without parole, raises two questions:

(1) Does a "knock and talk" procedure whereby police randomly knock on motel room doors at 11:30 p.m. to question the occupants in hopes that the occupants will allow the police to enter and ultimately consent to a search, violate the Fourth Amendment and Article 26 of the Maryland Declaration of Rights when such a procedure is carried out in the absence of articulable suspicion or probable cause; and is Mr. Scott [for that reason] entitled to suppression of the fruits of that illegal procedure?

(2) Did the lower court err in finding that Mr. Scott voluntarily consented to the search of his motel room?

Our answer to both questions is "No," and we shall therefore affirm the Circuit Court judgment.

## BACKGROUND

On May 19, 2000, Scott and his girlfriend, Antonia Hampton, rented Room 237 at the Regal Inn Motel, on Pulaski Highway (U.S. Route 40) in Baltimore County. Scott claimed it was just a night out with his girlfriend. He took to the room with him, however, some marijuana and a shoe box containing six pieces of crack cocaine, 63 vials of cocaine, 924 vial caps, 491 vials, an electronic scale, a razor blade, 178 ziploc baggies, and a box of sandwich bags. The shoe box was placed in a dresser drawer.

Just after 11:30 that evening, Detective Schwanke, accompanied by five or six other police officers, visited the motel. They had no warrant. Nor did they have probable cause to believe, or even a reasonable articulable suspicion, that there was any illegal activity at the time anywhere at the motel, including in Room 237. Schwanke said that the police had received a lot of complaints about prostitution, drug use, and drug distribution in the area and that the Regal Inn Motel, in particular, was known by detectives to be frequented by drug sellers and users. They "routinely" visited motels along that part of Route 40 after 11:00 in the evening, where they would knock on doors, identify themselves as police officers, advise any occupants of the problems plaguing the area, ask if they

could enter the room to speak to the occupants, and then question them about whether they had any contraband or knew of any unlawful activity. Schwanke said that he had conducted that kind of operation between 50 and 100 times at the Regal Inn Motel.

When the officers arrived at the motel on May 19, they apparently split into two teams, Schwanke and two or three other officers taking one row of rooms and the other team taking another. At 11:37 p.m., Schwanke knocked on the door to Room 237. He did not know who, if anyone, was in the room, as he had not checked the register or talked to any motel employee. The officers were in casual plain clothes, with their police badges displayed and their holstered handguns visible. There was some dispute, not particularly relevant, as to whether there were four, or only three, officers in Schwanke's group.

Schwanke said that he knocked on the door, that Scott opened the door, that Schwanke explained the problems plaguing the Route 40 area, and that he asked "if we could come in and talk to him." Schwanke continued that Scott "invited us in the room," that he said "come on in." Schwanke described the room as being about 10 feet by 12 feet, that it contained a double bed, a chest of drawers, an end table next to the bed, and a round card table, and that there was a bathroom off to the side. As soon as he entered, Schwanke detected the odor of burning marijuana. He also saw Ms. Hampton on the bed but could not recall how she, or Scott, was dressed. Notwithstanding his immediate detection of the burning marijuana, Schwanke said that he advised Scott and Hampton of the problems in the area and asked whether they knew of any illegal activity and whether they had any drugs or weapons in their possession. When they responded in the negative, Schwanke asked for permission to search the room, to which Scott said "go ahead." Schwanke said that, in addition to his olfactory perceptions, he had visually observed contraband in the room—a partially-smoked marijuana cigar in the ashtray.

At some point, apparently prior to the search, Ms. Hampton informed Schwanke that there were, indeed, other drugs in the room, and she retrieved another marijuana cigar. In response to the consent given by Scott, the police searched the room and recovered the shoe box containing the cocaine and paraphernalia from one of the dresser drawers. At that point, Scott and Hampton were placed under arrest. According to Schwanke, the total time that elapsed between the knock on the door and discovery of the box was two to three minutes. Schwanke could not recall whether, prior to discovery of the contraband, he ever asked Scott his name or requested any identification. In a subsequent interrogation at the police station, Scott admitted that the contraband was his and did not belong to Ms. Hampton.

Detective Schwanke confirmed that there was no peep hole in the door although Scott could have observed the officers by looking through the window to the room. He said that, prior to Scott's opening the door, he merely identified himself as a police officer and did not inform Scott of the purpose of his visit. He acknowledged as well that he never informed Scott that Scott had a right to refuse entry, that he did not have to open the door, that he did not have to talk to Schwanke, and that Schwanke had no legal basis for entering the room absent Scott's consent. Once in the room, and having received permission to look through it, Schwanke never asked for specific permission to search the drawers or open the shoe box.

Scott had a different version of what occurred. He said that the room was equipped with a hot tub and a television set, both of which were running when Detective Schwanke knocked on the door. Even with that background noise, the knock, he said was loud enough "to scare me and made me jump up and go straight to the door."[1] He heard Schwanke identify himself as police, whereupon Scott "cracked" the door

---

**1.** Officer Schwanke denied that he pounded on the door, but the court, in ruling on the suppression motion, found that he *had* pounded on the door.

and observed four officers. Scott was in his underwear and Ms. Hampton was either on or in the bed naked. Scott testified:

"As soon as I cracked the door, I seen four officers standing outside the door. One officer had his badge displayed and he asked me could he ask me some questions. I asked the officer about what? What for?

So he was like we just want to ask you—come in and ask you some questions. I'm like no. So he like well, all we are going to do is ask you some questions.

I am like all right. I opened the door a little bit. I was behind the door. As soon as I opened the door up, I stepped back and the officer must have thought I gave him okay to come in my room. Because as soon as I stepped back, the officer came straight in."

While Detective Schwanke spoke briefly with Scott, another officer went directly to the bathroom, opened that door and looked around, and then looked at the table containing the marijuana cigar. Scott said that he never told the officers that they could come in and search the room. When asked why he opened the door, he said that "I didn't think I had a choice. As soon as I stepped back, they came straight in the room." He added that he had to step back because there was no other way that he could open the door and that he did not try to stop the officers: "It is 11:30 at night and four officers are coming in my room. I didn't think I had a choice to tell him leave out or not." Scott said that, had the visitors not been police, he would not have opened the door.

On this evidence, Scott moved to suppress the items seized, arguing that, even if the testimony of Detective Schwanke was credited, the search and seizure were unlawful—that the entry into the room was unlawful and that there was no valid consent. The court concluded, and the State does not contest, that, absent consent, the police had no authority to enter the room—that even the smell of the burning marijuana detected upon the opening of the door did not authorize a warrantless entry. The court found no Constitutional violation in the

knocking itself and determined that "the police asked for permission to talk with the Defendant and asked for permission to enter the room, and that permission was given." It stated:

> "I'm persuaded that the entrance of the police into the room is with a voluntary consent of the Defendant. Police did not tell him that he had a right to refuse or they are not required to do so. Although that may be a factor in determining whether it was voluntary, I determined that it was a voluntary consent."

The court continued that the consent extended to the opening of the shoe box: "[I]f they are looking for drugs, drug paraphernalia, they can open shoe boxes."

## DISCUSSION

### Scott's Position

Scott views what occurred at the motel as a dual violation of his rights under the Fourth Amendment and Article 26 of the Maryland Declaration of Rights. He contends first that the very act of the police knocking on one's door late at night, without probable cause or articulable suspicion, constitutes a "seizure" within the meaning of those provisions. That conclusion, he avers, stems from the test enunciated by the Supreme Court in *Florida v. Bostick*, 501 U.S. 429, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991), namely, that, when a person is confronted by the police in a confined place where his or her freedom of movement is restricted for reasons independent of police conduct, the appropriate inquiry in determining whether the confrontation constitutes a "seizure" of the person is whether a reasonable person would feel free to decline the officer's request or otherwise terminate the encounter. Relying on cases such as *United States v. Jerez*, 108 F.3d 684 (7th Cir.1997), he urges that no reasonable person would have felt at liberty to ignore the presence of three or four officers pounding on his motel room door at 11:37 p.m., and that such conduct by the police necessarily constituted a warrantless seizure bereft of probable cause. His position is that, absent

probable cause or other legal justification, the police had no right to pound on his door in that manner and seek entry into his room. That argument, as articulated by Scott, focuses principally on whether the police had a legitimate reason for seeking the entry.

Scott also contends that, even if it is permissible for the police to engage in this kind of "knock and talk" operation and that their doing so does not constitute a "seizure," there was no valid consent to their entering and searching the room. Relying largely on *State v. Ferrier*, 136 Wash.2d 103, 960 P.2d 927 (1998), decided under Washington State law, he believes that a consent, even if actually given, cannot be regarded as voluntary unless the person is informed by the police that the person may lawfully refuse to consent to the search, may revoke any consent given, and may limit the scope of any consent. As no such advice was given to him, he asserts that any express or implied consent given to the police in this case was involuntary and therefore invalid.

### *Validity of the Procedure: Was There A Seizure?*

As we indicated, the so-called "knock and talk" procedure has become a popular one with police agencies, especially in drug enforcement activities, and dozens of cases have surfaced regarding it. As occurred here, it is a procedure in which police officers, lacking a warrant or other legal justification for entering or searching a dwelling place, approach the dwelling, knock on the door, identify themselves as law enforcement officers, request entry in order to ask questions concerning unlawful activity in the area, and, upon entry, eventually ask permission to search the premises. Permission is often given, and, if the police then find contraband or other evidence of illegal activity, the issue is raised of whether the procedure has in some way contravened the occupant's Fourth Amendment rights. *See United States v. Miller*, 933 F.Supp. 501, 505 (M.D.N.C.1996); *United States v. Cabrera*, 117 F.Supp.2d 1152, 1157 (D.Kan.2000); *United States v. Hardeman*, 36 F.Supp.2d 770, 777 (E.D.Mich.1999); *State v. Kriley*, 976 S.W.2d 16, 22 (Mo.App.1998). Absent some relevant State

statute imposing greater restrictions on the police, the validity of both the procedure itself and of any consent given by the occupant is determined in accordance with general Fourth Amendment (or comparable State Constitutional) jurisprudence.

Scott does not challenge the officers' right to be at the motel or in or on any of the common areas of the motel, and, indeed, he would have no standing to do so in any event. *See United States v. Roby*, 122 F.3d 1120, 1125 (8th Cir.1997) (hotel guest has reasonable expectation of privacy in hotel room but not in corridor outside the room); *United States v. Holland*, 755 F.2d 253, 255–56 (2d Cir.), *cert. denied*, 471 U.S. 1125, 105 S.Ct. 2657, 86 L.Ed.2d 274 (1985) (tenant in multi-tenant building had no expectation of privacy in common halls and lobbies). The Constitutional analysis begins with the knock on the door. The prevailing rule, applicable both to and beyond a pure "knock and talk" situation, is that, absent a clear expression by the owner to the contrary, police officers, in the course of their official business, are permitted to approach one's dwelling and seek permission to question an occupant. In *Davis v. United States*, 327 F.2d 301, 303 (9th Cir.1964), the court, in sustaining a *mid-day* "knock and talk" encounter, concluded:

"Absent express orders from the person in possession against any possible trespass, there is no rule of private or public conduct which makes it illegal per se, or a condemned invasion of the person's right of privacy, for anyone openly and peaceably, at high noon, to walk up the steps and knock on the front door of any man's 'castle' with the honest intent of asking questions of the occupant thereof—whether the questioner be a pollster, a salesman, or an officer of the law."

That principle is well-established, and, indeed, that statement from *Davis* is often quoted in both "knock and talk" and other situations that cause officers to approach people's homes. *See United States v. Hersh*, 464 F.2d 228, 230 (9th Cir.), *cert. denied*, 409 U.S. 1008, 93 S.Ct. 442, 34 L.Ed.2d 301

(1972); *United States v. Taylor*, 90 F.3d 903, 909 (4th Cir. 1996); *Jerez, supra*, 108 F.3d at 691; *United States v. Cormier*, 220 F.3d 1103, 1109 (9th Cir.2000), *cert. denied*, 531 U.S. 1174, 121 S.Ct. 1146, 148 L.Ed.2d 1009 (2001); *United States v. Tobin*, 923 F.2d 1506, 1511 (11th Cir.), *cert. denied*, 502 U.S. 907, 112 S.Ct. 299, 116 L.Ed.2d 243 (1991).

Scott sees two distinctions between *Davis* and the case at hand. First, he notes that, in *Davis*, the police did not go to Davis's home on a mere hunch, but had, in the words of the *Davis* court, "an abundance of information ... that [Davis] was trafficking in marijuana, particularly on the very weekend in question." *Davis, supra*, 327 F.2d at 303. Second, he points out that the approach in *Davis* was around 12:30 in the afternoon, a fact that was of some significance to the *Davis* court. The court observed that "[t]he time of day, coupled with the openness of the officers' approach to defendant's doorway, rules out the possible dangers to their persons which might have resulted from a similar unannounced call in the dead of night." *Id.* at 304.

Although some courts have noted those distinctions, none have found either of them individually dispositive in a Fourth Amendment analysis. In many instances, as in *Davis*, the police *have* had some suspicious or incriminating information regarding the premises at issue or an occupant of that premises, though not enough to justify a non-consensual entry, but in other cases, they did not have such particularized information. The requirement in this regard is simply that they be on some legitimate official business—not that they have, in advance, a particular level of incriminating information. As the Maine court declared in *State v. Cloutier*, 544 A.2d 1277, 1280 (Me.1988), an owner impliedly invites to intrude upon his or her property those with a legitimate social or business purpose, and that,

"[t]o come within the implied invitation, a police officer must be on some police business. That does not necessarily mean that the officer has to have probable cause or even an objectively reasonable suspicion that criminal activity is afoot. The police business may be administrative as well as

investigative, and it may be action based on a suspicion that turns out to be without substantial basis, provided the suspicion is held in good faith rather than as a pretext for an arbitrary search."

*Cloutier* involved an officer who, while patrolling a neighborhood at night in response to a report of a barking dog, observed a light coming from Cloutier's basement window. Because of recent burglaries in the area, but without any particularized suspicion that a burglary was in progress at Cloutier's home, he approached the otherwise darkened home and knocked on the door. Receiving no response, he glanced into the basement window, which was at ground level, and observed marijuana plants growing under a fluorescent light. The officer used that information to obtain a warrant which, because the officer was at the window on "legitimate police business," the court sustained. In *United States v. Cormier*, *supra*, 220 F.3d at 1109, the court, relying on *Florida v. Bostick, supra*, 501 U.S. at 434, 111 S.Ct. at 2386, 115 L.Ed.2d at 398, concluded that "no suspicion needed to be shown in order to justify the 'knock and talk.'" *See also State v. Frazier*, 142 N.C.App. 361, 542 S.E.2d 682, 688 (2001) ("knock and talk" sustained based on anonymous letter sent to motel owner indicating drugs were being sold from defendant's room).

We believe that to be a correct analysis. The Supreme Court made clear in *Florida v. Bostick, supra*, 501 U.S. at 434, 111 S.Ct. at 2386, 115 L.Ed.2d at 398, that "a seizure does not occur simply because a police officer approaches an individual and asks a few questions," and we concluded in *Ferris v. State*, 355 Md. 356, 374–75, 735 A.2d 491, 500–01 (1999), that "[t]his is so even if the police lack any suspicion, reasonable or otherwise, that an individual has committed a crime or is involved in criminal activity." A "seizure" occurs when a person is restrained by the police, and that must be judged from the interaction between the individual and the police, not by the level of suspicion, if any, in the officer's mind. The level of suspicion prior to the restraint is relevant, of course, to the *validity* of the seizure, but not to whether a

seizure has occurred. *See Terry v. Ohio,* 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 1879 n. 16, 20 L.Ed.2d 889, 905 n. 16 (1968): "Obviously, not all personal intercourse between policemen and citizens involves 'seizures' of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." Here, it is clear that Detective Schwanke and his fellow officers *were* on official police business. It is certainly part of a police officer's duties to pay close attention to the prospect of criminal activity and, consistent with the legitimate rights of the citizens whom they encounter, to seek information regarding it.

What some courts *have* found troubling are encounters of this kind that occur at a person's residence, temporary or permanent, late at night—the second ground of distinction raised by Scott. None have found a "seizure" based solely on that circumstance, but a number of courts have given weight to it, in conjunction with other factors, in determining that a "seizure" has occurred or that a resulting consent was not voluntary.

The analysis proceeds from the Supreme Court's pronouncements in *Florida v. Bostick.* In earlier cases, the Court had defined the line between a permissible encounter and a "seizure" as being whether "a reasonable person would have believed that he was not free to leave," *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497, 509 (1980), *Florida v. Royer,* 460 U.S. 491, 502, 103 S.Ct. 1319, 1326, 75 L.Ed.2d 229, 239 (1983), or whether a reasonable person would feel free "to disregard the police and go about his business." *California v. Hodari D.,* 499 U.S. 621, 628, 111 S.Ct. 1547, 1552, 113 L.Ed.2d 690, 698 (1991); *Michigan v. Chesternut,* 486 U.S. 567, 576, 108 S.Ct. 1975, 1981, 100 L.Ed.2d 565, 573 (1988). *See Ferris, supra,* 355 Md. at 374–76, 735 A.2d at 500–01. *Bostick* involved an encounter on a bus. As a routine investigatory procedure, police officers in Florida boarded inter-city buses at scheduled stops and asked permission of certain passengers to search their luggage. In the particular case, after being informed that he had the right

to refuse consent, Bostick, a passenger on a bus about to depart, agreed to the search of his suitcase, in which the police found cocaine, and the issue presented was whether the encounter leading to the consent constituted a "seizure" under the Fourth Amendment.

Bostick contended that the traditional test, of whether he would feel free simply to leave, was not applicable, first because of the cramped confines of the bus—there was nowhere else to go on the bus—and second because the bus was about to depart and if he disembarked, he would be stranded. The Court found that argument unavailing, noting that the fact that he did not feel free to leave the bus did not mean that the police seized him and that the confinement created by the bus had no bearing on whether the police conduct at issue was coercive. Borrowing from *INS v. Delgado*, 466 U.S. 210, 216, 104 S.Ct. 1758, 1763, 80 L.Ed.2d 247, 255 (1984), however, the Court concluded that "the appropriate inquiry is whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter." . *Bostick*, *supra*, 501 U.S. at 436, 111 S.Ct. at 2389, 115 L.Ed.2d at 400. That formulation, the Court held, was consistent with its earlier pronouncements; the "crucial test" remained that articulated in *Michigan v. Chesternut*—"whether, taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" *Bostick*, *supra*, 501 U.S. at 437, 111 S.Ct. at 2387, 115 L.Ed.2d at 400 (quoting *Chesternut*, *supra*, 486 U.S. at 569, 108 S.Ct. at 1977, 100 L.Ed.2d at 569). Where the encounter takes place, the Court added, "is one factor, but it is not the only one." *Bostick*, *supra*, 501 U.S. at 437, 111 S.Ct. at 2387, 115 L.Ed.2d at 400.

That approach was used in *Jerez*, *supra*, 108 F.3d 684, in finding a late-night "knock and talk" encounter to be an impermissible seizure. Milwaukee police officers assigned to the drug interdiction unit, while routinely looking for "target vehicles" from what they regarded as "source States," noticed a car parked at a motel near the airport with Florida tags.

Investigation revealed that the car was owned by Solis, whose Florida driver's license was reported suspended and who, a month earlier, had been arrested for smuggling contraband of some kind into the Dade County jail.

The officers decided to initiate a "knock and talk" procedure but were unable to do so until just after 11:00 p.m. When they arrived at Solis's room, no sounds were heard coming from the room. Two officers took turns knocking on the door, for several minutes, one of them eventually calling out "Police. Open up the door. We'd like to talk to you." Dissatisfied with the lack of a response and believing that they were being voluntarily ignored, one officer went outside and began knocking on the window to the room. The window knocking was loud enough for the officer in the hallway to hear it, notwithstanding that he continued knocking on the door. After about two minutes, the police heard movement inside the room. The officer at the window, while knocking, shined a flashlight into the room through a small opening in the draperies and saw Jerez move under the covers of the bed. Soon thereafter, Solis came to the window, opened the draperies, and observed the officer, who announced, "Sheriff's Department. Can we talk to you? Would you open up the door?" Solis shook his head "yes" in response and opened the door, clad only in his underwear.

The officers identified themselves, displayed their badges, and asked to speak with Solis. He responded in the affirmative and, as he opened the door further, the officers asked if they could come in and talk. Again, Solis said "yes," and allowed the officers to enter. They noticed a half-smoked marijuana cigarette, which Solis said was all they had. After questioning Solis and Jerez about why they were in Milwaukee, the officers asked and received permission to search the room. One officer located a suitcase which Jerez indicated was his and which he gave permission to search. Inside, the officers found cocaine, whereupon the pair was arrested. A further search revealed two other packages of cocaine. Following that discovery, Solis and Jerez confessed that they had

brought the drugs from Florida with the intent to sell them in Milwaukee.

The trial court found that the encounter did not amount to a *Terry* stop for which reasonable articulable suspicion was required, but rather treated it as similar to the situation of an officer approaching a citizen in an airport, bus terminal, or on the street. That court found that the officers had adequate justification for knocking on the door and window and that the entry and search were consensual. In a split decision, a panel of the Court of Appeals for the Seventh Circuit reversed and held that the officers' conduct amounted to a "seizure." The appellate court first determined that the appropriate test was not that applicable to airport, bus terminal, or street encounters, as the trial court assumed, but that set forth in *Bostick*, dealing with confined places—whether a reasonable person would feel free to decline the officers' request or otherwise terminate the encounter. Being in a motel late at night clad only in their underwear, the defendants, as a practical matter, could not have expressed their desire to terminate the encounter by leaving the scene.

The basis of the reversal was the panel majority's conclusion that the trial court had "failed to consider adequately two significant factors: the place and time of the encounter." *Id.* at 690. The appellate court noted that Fourth Amendment jurisprudence "has long recognized that police encounters at a person's dwelling in the middle of the night are especially intrusive," and, "[b]ecause our law and legal traditions long have recognized the special vulnerability of those awakened in the night by a police intrusion at their dwelling place," that Fourth Amendment jurisprudence "counsels that, when a knock at the door comes in the dead of night, the nature and effect of the intrusion into the privacy of the dwelling place must be examined with the greatest of caution." *Id.*

With that "deeply-rooted principle in mind," the court recounted the conduct of the police—the persistent knocking on the door, encirclement of the room by an officer proceeding to the window and engaging in loud knocking there, illuminating

Jerez's face as he lay in bed by shining a light into the room—and ultimately concluded that "[s]imply stated, this is a case in which the law enforcement officers refused to take 'no' for an answer," that "[t]heir actions, when objectively assessed, 'convey[ed] a message that compliance with their requests [was] required,'" and that, when Solis finally opened the door, he was submitting to the show of authority. *Id.* at 692 (quoting in part from *Bostick*). The court held that, under the totality of the circumstances surrounding the encounter—the late hour, the three minutes of knocking at the door, commands to open the door, up to two minutes of knocking at the window, shining the flashlight into the room—a seizure took place. The record, it said, did not support a conclusion that a reasonable person in the position of Solis and Jerez would have felt free to ignore the deputies and continue about their business. Having found a seizure, the court further determined that it was not supported by a reasonable articulable suspicion, that it was therefore violative of the Fourth Amendment, that the consent to search was fatally tainted by that improper seizure, and that the evidence found in the room was consequently inadmissible.

Judge Coffee dissented. He found nothing unusual in the case and no reason to set aside the factual findings of the trial judge. Indeed, he accused his colleagues of ignoring the Supreme Court's admonition in *Ornelas v. United States*, 517 U.S. 690, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996), that reviewing courts in Fourth Amendment cases should give deference to the conclusions of experienced law enforcement officers and resident trial judges and of engaging instead, "in appellate fact-finding and set[ting] forth *new and uncharted interpretations of Fourth Amendment law." Jerez, supra,* 108 F.3d at 700 (emphasis in original).

*Jerez* is a somewhat unusual—perhaps extreme—case. Apart from the lateness of the hour, the court was concerned about the persistence of the knocking, at both the door and the window, as well as shining a light into the room, all of which combined, in the panel majority's view, to preclude Solis and Jerez from maintaining the privacy and solitude of their

temporary dwelling and ignoring the demands and presence of the police. The late-night intrusion was not the dispositive factor, though it clearly was an important one. Other courts have declined to find a seizure based on a night-time "knock and talk" in the absence of other coercive circumstances. *See,* for example, *United States v. Taylor,* 90 F.3d 903, 905 (4th Cir.1996) (approach made at 9:15 p.m.); *United States v. Cormier, supra,* 220 F.3d 1103, 1107 ("knock and talk" at motel commencing just after 8:00 p.m.).

It may well be that, as a matter of public policy, non-emergency encounters of this kind should be tightly controlled or limited. Late-night intrusions into people's homes are, and should be, discouraged and should not be permitted unless necessary. Balanced against that, of course, is that, when a hotel or motel is involved, the room is not likely to be occupied until the evening—perhaps the late evening. Legislatures and Executive Branch officials with supervisory power over the police are competent to balance these considerations and instigate such controls or limitations they find appropriate. Not every intrusion that contravenes one's conception of good public policy amounts to a Constitutional violation, however. The test, for a seizure, remains that enunciated in *Bostick,* which requires taking into consideration all of the circumstances. Judicially created bright-line rules with respect to time alone simply will not work—are we to say that a knock at 9:00 is Constitutional but one at 10:00 is not?

■ There was no Fourth Amendment seizure in this case. There was a knock—perhaps a loud knock, but not a sustained or persistent one. Scott, though allegedly startled, was not awakened by it; he and his girlfriend were up, the television set was on, and the hot tub was running. The police identified themselves before Scott opened the door, and they merely asked, not demanded, that he open the door and talk with them. We are not prepared, alone among courts and in contravention of the principles announced in *Bostick,* to find every late-night "knock and talk" encounter a Fourth Amend-

ment seizure, without regard to all other relevant circumstances.

Nor are we prepared to make such a holding based on Article 26 of the Maryland Declaration of Rights. Notwithstanding its lack of textual consistency with the Fourth Amendment, we have consistently construed Article 26 as being *in pari materia* with the Federal provision and have accepted as persuasive the Supreme Court's construction of the Fourth Amendment.[2] *See Gadson v. State*, 341 Md. 1, 668 A.2d 22 (1995), *cert. denied*, 517 U.S. 1203, 116 S.Ct. 1704, 134 L.Ed.2d 803 (1996); *Gahan v. State*, 290 Md. 310, 430 A.2d 49 (1981).

### Consent to the Search

Although the courts have generally sustained the "knock and talk" procedure as a legitimate police technique, not amounting to an unconstitutional seizure, they have examined with caution the consents allegedly obtained by the police once they are permitted to enter the room. To the extent that the courts invalidate searches conducted as part of a "knock and

---

**2.** Article 26 provides that "all warrants, without oath or affirmation, to search suspected places, or to seize any person or property, are grievous and oppressive; and all general warrants to search suspected places, or to apprehend suspected persons, without naming or describing the place, or the person in special, are illegal, and ought not to be granted." Although in *Mason v. Wrightson*, 205 Md. 481, 486, 109 A.2d 128, 130 (1954), we noted that the Article, which deals with the requirements and limitations of a warrant, had no direct application to a warrantless search, we concluded in *Givner v. State*, 210 Md. 484, 492–93, 124 A.2d 764, 768 (1956) that the Article had long been read *in pari materia* with the Fourth Amendment and served to preclude courts from authorizing searches that would violate the Federal provision. Indeed, quoting from *Miller v. State*, 174 Md. 362, 373, 198 A. 710, 716 (1938), we observed that "[i]f a general search warrant is condemned, how much more obnoxious must be an authorization to conduct a general and indiscriminate search of persons and property without any warrant." In more recent times, we have tended to use the *in pari materia* construction essentially to equate the Federal and State provisions, notwithstanding their very different language, *see Gadson v. State*, 341 Md. 1, 668 A.2d 22 (1995), and to construe the Maryland provision in conformance with constructions given to the Fourth Amendment by the Supreme Court. *See Gahan v. State*, 290 Md. 310, 430 A.2d 49 (1981); *Givner, supra*, 210 Md. 484, 124 A.2d 764.

talk" procedure, it is usually upon a finding that the consent, actually given, was not voluntary.

Just as the basic ground rules for determining whether there has been a Fourth Amendment seizure were set forth in *Florida v. Bostick,* the comparable ground rules for determining the validity of a consent to search were announced in *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). *Schneckloth* arose from a Federal habeas corpus proceeding challenging a conviction obtained in State court; it involved the search of a car following a traffic stop, the issue being whether the consent allegedly given to the search was voluntary or in submission to an expression of authority. The Court of Appeals for the Ninth Circuit, in setting aside the State conviction, treated a consent as a waiver of one's Fourth and Fourteenth Amendment rights, thereby requiring the State to establish not only that the consent was voluntary but also that it had been given with an understanding that it could have been withheld. Under the Ninth Circuit Court's approach, consent could not be found merely from the absence of coercion and a verbal expression of assent; there had to be evidence that the defendant knew that consent could be withheld. *Id.* at 229–30, 93 S.Ct. at 2049, 36 L.Ed.2d at 864.

The Supreme Court repudiated both that approach and its underpinning. The underpinning was the notion that the consent to a search constituted a waiver of a Constitutional right and that, under the test for waiver set forth in *Johnson v. Zerbst,* 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938), the State was required to demonstrate an intentional relinquishment or abandonment of a *known* right or privilege. The *Schneckloth* Court declared, however, that the *Johnson v. Zerbst* standard was enunciated in the context of the safeguards of a fair criminal trial and had no application to the Fourth Amendment:

> "There is a vast difference between those rights that protect a fair criminal trial and the rights guaranteed under the Fourth Amendment. Nothing, either in the purposes behind requiring a 'knowing' and 'intelligent' waiver of trial

rights, or in the practical application of such a requirement suggests that it ought to be extended to the constitutional guarantee against unreasonable searches and seizures."

*Schneckloth, supra,* 412 U.S. at 241, 93 S.Ct. at 2055, 36 L.Ed.2d at 871.

Having rejected the foundation of the Ninth Circuit Court's approach, the Supreme Court rejected the approach itself as unworkable, noting that "the near impossibility of meeting this prosecutorial burden suggests why this Court has never accepted any such litmus-paper test of voluntariness." *Id.* at 230, 93 S.Ct. at 2049, 36 L.Ed.2d at 864. The Court discarded as equally impractical the suggestion that such a burden could be met by requiring the police to advise the person of his/her right to refuse consent before eliciting the consent:

"That, however, is a suggestion that has been almost universally repudiated by both federal and state courts, and, we think, rightly so. For it would be thoroughly impractical to impose on the normal consent search the detailed requirements of an effective warning."

*Id.* at 231, 93 S.Ct. at 2049–50, 36 L.Ed.2d at 865.

In place of a litmus-paper test, the Court concluded that "whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *Id.* at 227, 93 S.Ct. at 2047–48, 36 L.Ed.2d at 862–63. In the final paragraph of its Opinion, the Court explained:

"We hold only that when the subject of a search is not in custody and the State attempts to justify a search on the basis of his consent, the Fourth and Fourteenth Amendments require that it demonstrate that the consent was in fact voluntarily given, and not the result of duress or coercion, express or implied. Voluntariness is a question of fact to be determined from all the circumstances, *and while the subject's knowledge of a right to refuse is a factor to be taken into account, the prosecution is not required to*

*demonstrate such knowledge as a prerequisite to establishing a voluntary consent."*

*Id.* at 248–49, 93 S.Ct. at 2059, 36 L.Ed.2d at 875 (emphasis added). Those principles were confirmed more recently in *Ohio v. Robinette,* 519 U.S. 33, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996). *See also Ferris, supra,* 355 Md. 356, 379–80, 735 A.2d 491, 503; *United States v. Heath,* 58 F.3d 1271, 1275–76 (8th Cir.), *cert. denied,* 516 U.S. 892, 116 S.Ct. 240, 133 L.Ed.2d 167 (1995); *United States v. Cormier, supra,* 220 F.3d 1103, 1112–13. We therefore reject Scott's argument that a consent to search one's dwelling may not be held valid under the Fourth Amendment unless the person is advised, in advance, that he/she has a right to refuse or limit the consent. That is clearly not the law.

Courts dealing with the consent issue, as it arises under a "knock and talk" approach, have looked at the totality of the circumstances, as the Supreme Court has directed. They have considered such things as the number of officers present, the age, maturity, intelligence, and experience of the consenting party, the officers' conduct and other circumstances under which the consent was given, and the duration, location, and time of the encounter. *See United States v. Bynum,* 125 F.Supp.2d 772, 783 (E.D.Va.2000) (following *United States v. Lattimore,* 87 F.3d 647, 650 (4th Cir.1996) (*en banc* )); *compare Cormier, supra,* 220 F.3d at 1112 (examining whether the defendant was in custody, the officers had their guns drawn, *Miranda* warnings were given, the defendant was told he/she had a right to refuse consent, and the defendant was told that a search warrant could be obtained). The factors examined by the Fourth Circuit Court are similar, in kind, to those that, in *Ferris, supra,* 355 Md. at 377, 735 A.2d at 502, we found relevant in the context of whether a seizure had occurred prior to the search of a car following a traffic stop.

■ In some instances, the consent has been found involuntary. *See United States v. Hardeman,* 36 F.Supp.2d 770 (E.D.Mich.1999); *United States v. Miller, supra,* 933 F.Supp. 501; *United States v. Bynum, supra,* 125 F.Supp.2d 772. In

other instances, it has been found voluntary. *See Cormier, supra,* 220 F.3d 1103; *United States v. Severe,* 29 F.3d 444 (8th Cir.1994), *cert. denied,* 513 U.S. 1096, 115 S.Ct. 763, 130 L.Ed.2d 660 (1995); *State v. Land,* 106 Or.App. 131, 806 P.2d 1156 (1991). Because the issue of consent is a question of fact, the Federal appellate courts review the trial court's factual determination under the clearly erroneous standard. *See Cormier, supra,* 220 F.3d at 1112; *Severe, supra,* 29 F.3d at 446. Although we review a trial court's legal conclusions *de novo,* we have adopted the clearly erroneous standard as well in our consideration of factual findings. We examine the evidence presented at the suppression hearing in a light most favorable to the State. *In Re Tariq A–R–Y,* 347 Md. 484, 488–89, 701 A.2d 691, 693 (1997), *cert. denied,* 522 U.S. 1140, 118 S.Ct. 1105, 140 L.Ed.2d 158 (1998); *Ferris, supra,* 355 Md. at 368–69, 735 A.2d at 497.

 We are not persuaded by this record that the Circuit Court committed any error of law or any clear error of fact in determining that Scott (1) consented to the search of his room, and (2) the consent was voluntary. In hindsight, that was a foolish decision, from his point of view, but the issue is not whether the consent was an intelligent one, only whether it was voluntary. The evidence, in a light most favorable to the State, shows no police overbearing, or even impoliteness. The entire incident, from knock to completion of the search, took only two to three minutes. Scott was not inexperienced; he had previously been convicted of a drug offense, which accounted for his increased sentence. His own testimony regarding his brief conversation with Detective Schwanke prior to admitting the officers to the room indicated an awareness on his part that he could have refused entry. Once he allowed them to enter, he exposed them immediately to one item of contraband and, according to Detective Schwanke, Ms. Hampton voluntarily produced another.

We turn, finally, to Scott's entreaty that we forsake this Fourth Amendment jurisprudence and follow the decision of the Washington Supreme Court in *State v. Ferrier, supra,* 136

Wash.2d 103, 960 P.2d 927. That case arose out of a "knock and talk" that led to the discovery of marijuana plants being grown in the defendant's home. Some of the facts relating to the entry and search were in dispute, but the State conceded that the police had not advised the defendant, prior to asking for her consent to the search, of her right to refuse or limit any consent. She challenged the search on both Fourth Amendment and Washington State Constitutional grounds. The State Supreme Court declined to address the Federal claims and decided the matter solely on the basis of Article I, § 7 of the Washington Constitution, which stated that "[n]o person shall be disturbed in his private affairs, or his home invaded, without authority of law."

The court noted that the State provision differed from the Fourth Amendment in that, unlike the Federal provision, it "clearly recognizes an individual's right to privacy with *no* express limitations." *Ferrier, supra,* 960 P.2d at 930 (quoting *State v. Young,* 123 Wash.2d 173, 867 P.2d 593 (1994) (quoting, in turn, *State v. Simpson,* 95 Wash.2d 170, 622 P.2d 1199 (1980))). The Washington Legislature, moreover, had enacted a statute that made it a "gross misdemeanor" for any police officer "to enter and search any private dwelling house or place of residence without the authority of a search warrant issued upon a complaint as by law provided." *Ferrier, supra,* 960 P.2d at 931(citing to RCW 10.79.040). As the police conceded that they resorted to the "knock and talk" procedure in order to avoid the need to obtain a warrant, the court concluded that their conduct was unlawful. The crux of the court's holding, however, was that the "knock and talk" proce-dure violated the defendant's State Constitutional right to privacy "because she was not advised, prior to giving her consent to the search of her home, that she could refuse to consent." *Ferrier, supra,* 960 P.2d at 933. It expressed the belief that the inherently coercive nature of a "knock and talk" procedure could be ameliorated by requiring the giving of such advice, so it adopted, as a judicial prophylaxis, the following rule:

"[W]hen police officers conduct a knock and talk for the purpose of obtaining consent to search a home, and thereby avoid the necessity of obtaining a warrant, they must, prior to entering the home, inform the person from whom consent is sought that he or she may lawfully refuse to consent to the search and that [he or she] can revoke, at any time, the consent that [he or she] give[s], and can limit the scope of the consent to certain areas of the home. The failure to provide these warnings, prior to entering the home, vitiates any consent given thereafter."

*Id.* at 934.

New Jersey has taken a somewhat similar approach on State law grounds. In *State v. Johnson*, 68 N.J. 349, 346 A.2d 66 (1975), the New Jersey Supreme Court, though recognizing *Schneckloth* as binding in terms of Fourth Amendment construction, disavowed its holding for purposes of an identically worded New Jersey Constitutional provision. It concluded that the validity of a consent to a search, under the State provision, "must be measured in terms of waiver; *i.e.,* where the State seeks to justify a search on the basis of consent it has the burden of showing that the consent was voluntary, an essential element of which is knowledge of the right to refuse consent." *Id.* at 68.

For the two reasons previously stated, we decline to follow the approach of Washington and New Jersey. It is clearly and diametrically inconsistent with *Schneckloth,* and therefore does not represent a correct statement of Federal law governing the Fourth Amendment. Nor, under our jurisprudence, does it therefore constitute a correct statement of Article 26 of the Maryland Declaration of Rights, which we have held is to be read *in pari materia* with the Fourth Amendment. We declined to adopt a *per se* rule of this kind in *Ferris,* and shall not do so here.

JUDGMENT AFFIRMED, WITH COSTS.

RAKER, Judge, dissenting:

I would reverse the judgment of conviction. Under the Fourth Amendment to the United States Constitution and

Article 26 of the Maryland Declaration of Rights, appellant, Aaron Scott, was unlawfully seized by the police.

I would reverse the judgment of conviction because I believe that the trial court erred in denying appellant's motion to suppress. The suppression court made no findings as to whether appellant was seized and, if so, whether that seizure was lawful. Because I believe that the seizure was unlawful and the consent was obtained during that illegal seizure, the consent is not valid unless the State proves, and the trial court finds, that the consent was not the product of the unlawful seizure and that the consent was voluntary. The trial court should have made factual findings requisite to a proper analysis of the validity of the consent.[1]

This case involves the law enforcement technique known as the "knock and talk," an investigatory tool that apparently has been around for many decades, but has not made itself into court opinions until the early 1990's. It is an investigative technique whereby police officers seek to gain an occupant's consent to search a dwelling, without a search warrant, when they lack probable cause or reasonable suspicion to believe that a crime is occurring inside.

It is well settled that the Fourth Amendment and Article 26 apply to all seizures of a person. *See United States v. Mendenhall,* 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980); *Ferris v. State,* 355 Md. 356, 735 A.2d 491 (1999). As the majority notes, in a case such as this one, the proper test to determine whether a person has been seized is whether a reasonable person would not feel free to decline the officers' requests or otherwise terminate the encounter.[2] *See Florida*

---

**1.** The trial court found that the police "did knock and they did pound. They asked for permission and he granted it." The court concluded that the "entrance of the police into the room is with a voluntary consent of the Defendant."

**2.** This case is more like the bus encounter in *Florida v. Bostick,* 501 U.S. 429, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991), than an encounter on an open street. Therefore, as the majority recognizes, *see* maj. op. at 137–138, the test for assessing whether a seizure has occurred is

*v. Bostick*, 501 U.S. 429, 436, 111 S.Ct. 2382, 2389, 115 L.Ed.2d 389 (1991); *Florida v. Royer*, 460 U.S. 491, 501, 103 S.Ct. 1319, 1326, 75 L.Ed.2d 229 (1983). Considering all of the circumstances, and particularly the *time and place* of the encounter, I would find, contrary to the majority, *see* maj. op. at 137–138, that there was a seizure in this case.

I do not believe that a reasonable person in the shoes of appellant, given the place, time, and circumstances of the encounter, would terminate the encounter at the door and feel free to decline the officers' request to search his motel room. There was no probable cause or reasonable suspicion to support any seizure and, therefore, the seizure was unlawful. Given that the initial seizure of appellant's person by the police was unlawful, in order for any consent given by appellant to be voluntary, rather than a mere acquiescence to a show of authority, such consent would be valid only if the court found it to be sufficiently purged of the primary taint of the illegal seizure. *See Brown v. Illinois*, 422 U.S. 590, 599, 95 S.Ct. 2254, 2259, 45 L.Ed.2d 416 (1975); *McMillian v. State*, 325 Md. 272, 286–87, 600 A.2d 430, 437 (1992); *State v. Wilson*, 279 Md. 189, 203, 367 A.2d 1223, 1232 (1977). Absent such a showing of attenuation, the evidence obtained as a result of such consent should have been suppressed. Therefore, the Circuit Court erred in denying appellant's motion to suppress and admitting the evidence taken from his motel room.

Our review of the Circuit Court's denial of a motion to suppress is based solely upon the record of the suppression hearing. *See Ferris*, 355 Md. at 368, 735 A.2d at 497. We review the trial court's factual findings in the light most favorable to the State, pursuant to a clear error standard, but we review the legal conclusions *de novo. See id.; In re Tariq A–R–Y*, 347 Md. 484, 488, 701 A.2d 691, 693 (1997).

---

whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter and not whether a reasonable person would have believed that he was not free to leave, the test applicable to encounters on a public street.

Appellant testified that he told the officers that they could not enter the motel room; the officers' testimony was diametrically opposite—that appellant said "you may come in." The Circuit Court is charged with resolving factual conflicts because it is in a position to assess the demeanor and credibility of witnesses, and it did so here by accepting the police testimony and rejecting appellant's testimony of what occurred before the officers' entry into the motel room. Unless clearly erroneous, we are bound by that finding. I do not find the factual finding clearly erroneous. Nonetheless, even accepting the officers' version of events, the trial court erred in its legal conclusion because the court did not consider whether appellant's opening of the door and his consent to the search of the room was voluntary in the proper jurisprudential context of whether he was seized and whether that seizure was lawful within the meaning of the Fourth Amendment and Article 26.

Evidence obtained by the police as a direct result of an illegal seizure or search is not admissible against the defendant. *See Wong Sun v. United States*, 371 U.S. 471, 484, 83 S.Ct. 407, 415, 9 L.Ed.2d 441 (1963). Whether a consent to search is voluntary is a mixed question of law and fact. *See Ferris*, 355 Md. at 368, 735 A.2d at 497; *Tariq*, 347 Md. at 489, 701 A.2d at 693. In considering the voluntariness of a consent to search following an unlawful seizure by the police, the relevant inquiry is whether the evidence was obtained as a direct result of the illegality or instead by means sufficiently distinguishable to be purged of the primary taint. *See Wong Sun*, 371 U.S. at 488, 83 S.Ct. at 417, 9 L.Ed.2d 441; *Miles v. State*, 365 Md. 488, ——, 781 A.2d 787 (2001) (Raker, J., dissenting); *McMillian*, 325 Md. at 288–89, 600 A.2d at 438. If the connection between the evidence and the illegality is so attenuated as to dissipate the taint, the evidence will not be suppressed. *See Wong Sun*, 371 U.S. at 487, 83 S.Ct. at 417, 9 L.Ed.2d 441. The defendant's consent must sufficiently be an act of free will to purge the primary taint of the illegal conduct. *See Wong Sun*, 371 U.S. at 486, 83 S.Ct. at 416–17, 9 L.Ed.2d 441.

No one factor is dispositive. Factors that courts must consider in determining whether the consent to search was an act of free will that was independent of the primary illegality are the "temporal proximity of the arrest and the statements [consent], the presence of intervening circumstances, and particularly, the purpose and flagrancy of official misconduct." *Brown,* 422 U.S. at 603–04, 95 S.Ct. at 2261–62, 45 L.Ed.2d 416; *United States v. Valencia,* 913 F.2d 378, 380–84 (7th Cir.1990); *United States v. Buchanan,* 904 F.2d 349, 353–56 (6th Cir.1990); *Ferguson v. State,* 301 Md. 542, 548–49, 483 A.2d 1255, 1258 (1984); 3 WAYNE R. LaFAVE, SEARCH AND SEIZURE § 8.2(d), at 189–90 (3d. ed.1996). The *Brown* attenuation analysis applies to the effectiveness of consent following an illegal seizure, as well as to the admissibility of a statement or a confession. "In *Wong Sun,* the Court pronounced the principles to be applied where the issue is whether statements *and other evidence* obtained after an illegal arrest *or search* should be excluded." *Brown,* 422 U.S. at 597, 95 S.Ct. at 2259, 45 L.Ed.2d 416 (emphasis added). *See, e.g., State v. Blackmore,* 186 Ariz. 630, 925 P.2d 1347 (1996); *State v. Monge,* 173 Ariz. 279, 842 P.2d 1292 (1992). When evidence is obtained pursuant to consent following an illegal seizure by the police, the court must find that the consent was not only voluntary, but it must also not be an exploitation of the prior illegality.

The trial court made no findings as to whether appellant was subject to an illegal detention at the time of his purported consent. Nonetheless, there is little, if any, dispute as to the facts in the record. Appellant is a twenty-two-year-old male with a tenth grade education. The trial judge found that "the officers did knock and they did pound" on the door of appellant's motel room. In response, appellant asked who was at the door, and the officer said "police." Appellant opened the door and the officers entered the room, requesting permission to search. It was 11:37 p.m., the officers had visible badges and weapons, the hot tub water in the room was running, and appellant was in his undershorts and in the room with a woman. He was not told that he could decline to consent or,

for that matter, that he could decline to open the door. As I have indicated, in my view, appellant was unlawfully seized.

Although the common law did not expressly prohibit nighttime searches, there was strong hostility to such searches of dwelling houses. *See, e.g., Jones v. United States,* 357 U.S. 493, 78 S.Ct. 1253, 2 L.Ed.2d 1514 (1958); *United States ex rel. Boyance v. Myers,* 398 F.2d 896 (3rd Cir.1968); *Hawaii v. Richardson,* 80 Hawai'i 1, 904 P.2d 886 (1995) (stating that "[o]ne policy underlying the nighttime search prohibition is protection of the greater expectation of privacy that individuals possess in their homes at night"); *Com. v. Grimshaw,* 413 Mass. 73, 595 N.E.2d 302 (1992); THOMAS M. COOLEY, CONSTITUTIONAL LIMITATIONS 430 (7th ed.1903). Nighttime searches of dwelling places "were regarded with revulsion because of the indignity of rousing people from their beds." *Com. v. DiStefano,* 22 Mass.App.Ct. 535, 541, 495 N.E.2d 328 (1986). The rationale is "that nighttime police intrusion posed a great threat to privacy, violated the sanctity of home, and endangered the police and slumbering citizens." 2 LAFAVE, *supra,* § 4.7(b), at 266. Additionally, the "[a]voidance of potential violence arising from non-recognition of the official identity of the executing officer also underlies the federal rule restricting authorization of nighttime searches." *Oregon v. Brock,* 294 Or. 15, 653 P.2d 543 (1982).

The federal government and many states have enacted nighttime search limitations, requiring more than probable cause to justify the execution of a search warrant on a dwelling place in the nighttime. *See, e.g.,* FED.R.CRIM.P. 41; [3] ARIZ.REV.STAT. § 13–1447 (1970) (allowing a nighttime search only when directed by magistrate, after a finding of good cause); CAL.PENAL CODE § 1533 (2001) (requiring a showing of good cause to execute a warrant other than between the hours of 7 a.m. and 10 p.m.); DEL.CODE ANN. tit. 11, § 2308 (2000)

---

**3.** FED.R.CRIM.P. 41(c) provides: "The warrant shall be served in the daytime, unless the issuing authority, by appropriate provision in the warrant, and for reasonable cause shown, authorizes its execution at times other than daytime." For a history of the rule, see *Gooding v. United States,* 416 U.S. 430, 94 S.Ct. 1780, 40 L.Ed.2d 250 (1974).

(permitting nighttime warrant issuance only when it is "necessary in order to prevent the escape or removal of the person or thing to be searched for"); IDAHO CODE § 19–4411 (2000) (requiring judicial approval and reasonable cause for a nighttime search, mirroring FED.R.CRIM.P. 41(c)); MASS. GEN. LAWS ch. 276, § 2 (2001) (requiring judicial approval and reasonable cause for nighttime search); MINN.STAT. § 626.14 (2000) (requiring that the court determine that a nighttime search is necessary to prevent the loss, destruction, or removal of the objects of the search); NEB.REV.STAT. § 29–814.04 (2001) (requiring a warrant to be served in the daytime unless public interest demands that it not be so restricted); OR.REV.STAT. § 133.565(3) (1999) (restricting search warrant execution to daytime hours unless the warrant permits otherwise); UTAH CODE ANN. § 77–23–5(1) (1990) (requiring judicial authorization for a nighttime search based on reasonable cause to believe that it is necessary to seize the property prior to it being concealed, destroyed, damaged, or altered, or for other good reason); ARK. R.CRIM. P. 13.2(c) (requiring that a warrant authorize a nighttime search and that a judicial officer have reasonable cause to believe that the place to be searched is difficult of speedy access, the objects to be seized are in danger of imminent removal, or the warrant can only be safely or successfully executed at nighttime or under circumstances the occurrence of which is difficult to predict with accuracy); ME. R.CRIM. P. 41(c) (requiring that the warrant affirmatively authorize execution at a time other than between the hours of 7 a.m. and 7 p.m.); VT. R.CRIM. P. 41(c) (requiring warrant service between the hours of 6:00 a.m. and 10:00 p.m. unless the warrant directs that it may be served at any time).

It strikes me as anomalous that the police should have broader powers to invade a person's privacy under "knock and talk" procedures, where probable cause or reasonable suspicion are lacking, than when they have secured a search warrant that ordinarily must be served in the daytime.

I agree with the analysis of the United States Court of Appeals for the Seventh Circuit in *United States v. Jerez*, 108 F.3d 684 (7th Cir.1997). In its discussion of a "knock and

talk" case with facts somewhat similar to the one *sub judice,* the court placed heavy emphasis on the fact that the police intrusion was in the nighttime in its determination of whether there had been a seizure. The court explained:

"In making the assessment as to whether a seizure occurred, the circumstances must, of course, be assessed in terms of the values protected by the Fourth Amendment. Here, the district court, required to assess the totality of the circumstances, failed to consider adequately two significant factors: the place and the time of the encounter. The police confronted the appellants in the middle of the night and sought admission to their dwelling place. Our jurisprudence interpreting the Fourth Amendment has long recognized that police encounters at a person's dwelling in the middle of the night are especially intrusive. Indeed, the special vulnerability of the individual awakened at the privacy of his place of repose during the nighttime hours to face a nocturnal confrontation with the police was recognized in the common law that antedates our separation from England."

*Id.* at 690 (citations omitted). Likewise, the Circuit Court for Baltimore County failed to consider the place and time of the encounter or whether appellant had been detained.

The *Jerez* court continued:

"Because our law and legal traditions long have recognized the special vulnerability of those awakened in the night by a police intrusion at their dwelling place, our Fourth Amendment jurisprudence counsels that, when a knock at the door comes in the dead of night, the nature and effect of the intrusion into the privacy of the dwelling place must be examined with the greatest of caution. Therefore, in recognizing the particular intrusiveness of nocturnal encounters with the police at one's dwelling, the courts of appeals have stressed the impact of such encounters on the individual dwelling there. For instance, our colleagues in the First Circuit have noted specifically that the reason for limiting nocturnal searches is to prevent 'abrupt intrusions on sleeping residents in the dark.' *United States v. Young,* 877

F.2d 1099, 1104 (1st Cir.1989) (Breyer, J.). Likewise, the Second Circuit has noted the 'peculiar abrasiveness' of intrusions by law enforcement officials at night. *United States v. Ravich,* 421 F.2d 1196, 1201 (2d. Cir.), *cert. denied,* 400 U.S. 834, 91 S.Ct. 69, 27 L.Ed.2d 66 (1970). And the Tenth Circuit, in *Harless v. Turner,* 456 F.2d 1337, 1338–39 (10th Cir.1972) (citing *Villano v. United States,* 310 F.2d 680, 684 (10th Cir.1962); *United States v. Page,* 302 F.2d 81 (9th Cir.1962)), invalidated an individual's consent to search because it was obtained after the individual was 'routed' out of bed in the middle of the night."

*Id.* at 690–91.

To find under the circumstances *in this case* that this late-night "knock and talk" encounter amounted to a Fourth Amendment seizure does not mean that *every* "knock and talk" encounter is a seizure under the Fourth Amendment. Each case must be judged under the totality of the circumstances. A review of the conduct of the police in the instant case leads to the same conclusion reached by the court of appeals in *Jerez.* The time was 11:37 p.m. In response to what the trial court characterized as the "pounding" of three, and perhaps four, police officers directing appellant to open the door, he did so. Handguns were visible, and police badges were then displayed by the officers. The officers announced that they were police and directed appellant to open the door and permit them to search the premises. The officers did not inform appellant that he did not have to open the door or that he did not have to consent to their request to search his motel room.

I reject the State's argument that "Scott permitted the police to enter his room when he could have ignored the knock on the door." It hardly would be reasonable for a motel guest, in a room without a peephole in the door, to decline to open the door in response to the officers' pounding and demand to open the door. Would the room occupant be unreasonable to fear that refusing to open the door might be a health or safety risk? Or a fire? Or an emergency evacuation? The State's argument that the officers did not block

Scott's exit is equally unpersuasive. What was Scott supposed to do at that hour of night, dressed only in his undershorts, with his naked companion in the room? Simply exit the room? It also is not realistic to posit that a reasonable person, having initially opened the door to police, would feel free to terminate the encounter with the police and refuse entry into a motel room.

When a person opens the door under the circumstances presented herein, it is not reasonable to conclude that the person has opened the door voluntarily, when he is merely complying with the police show of authority and demand to open the door. *Cf. Bumper v. North Carolina*, 391 U.S. 543, 550, 88 S.Ct. 1788, 1792, 20 L.Ed.2d 797 (1968). The officers were not required by the Fourth Amendment to inform appellant that he did not have to consent to a search of his room; knowledge of the right to refuse consent to search is not necessary to prove the voluntariness of consent. *See Ohio v. Robinette*, 519 U.S. 33, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996); *Schneckloth v. Bustamonte*, 412 U.S. 218, 246, 93 S.Ct. 2041, 2057, 36 L.Ed.2d 854 (1973). *But cf. State v. Ferrier*, 136 Wash.2d 103, 960 P.2d 927 (1998) (holding that, under state law, police are required to inform a suspect of the right to refuse consent prior to entering a dwelling). It is, however, a factor to be considered in the determination of the voluntariness of the consent. *See Bustamonte*, 412 U.S. at 235, 93 S.Ct. at 2051, 36 L.Ed.2d 854; *Ferris*, 355 Md. at 379–80, 735 A.2d at 503.

> As the *Jerez* court observed:
>
> "[T]here is no rule of private or public conduct which makes it illegal per se, or a condemned invasion of the person's right of privacy, for anyone openly and peaceably, at high noon, to walk up the steps and knock on the front door of any man's 'castle' with the honest intent of asking questions of the occupant thereof—whether the questioner be a pollster, a salesman, or an officer of the law."

*Jerez*, 108 F.3d at 691 (citations omitted). But, when the knocking comes at night, at an hour when most people are in

bed, and three or four officers are present, with weapons visible, displaying police badges, the same does not hold true.

The Supreme Court of Washington considered the police technique of "knock and talk" in the *Ferrier* case. The court based its decision entirely on the Washington State Constitution and, thus, the holding is not authority when considering the "knock and talk" under the Fourth Amendment. Nonetheless, the court's rationale is persuasive:

"Central to our holding is our belief that any knock and talk is inherently coercive to some degree. While not every knock and talk effort may be accompanied by as great a show of force as was present here, we believe that the great majority of home dwellers confronted by police officers on their doorstep or in their home would not question the absence of a search warrant because they either (1) would not know that a warrant is required; (2) would feel inhibited from requesting its production, even if they knew of the warrant requirement; or (3) would simply be too stunned by the circumstances to make a reasoned decision about whether or not to consent to a warrantless search. In this context, Ferrier's testimony, which was supported by the officers, that she was afraid and nervous seems totally reasonable. Indeed, we are not surprised that, as noted earlier, an officer testified that virtually everyone confronted by a knock and talk accedes to the request to permit a search of their home."

*Ferrier*, 960 P.2d at 933.

The court held that, in order to satisfy the state constitutional right to privacy, and in order for the consent to search to be voluntary, a person must be advised that he or she could refuse to consent to search. *See id.* at 934. The court stated:

"We believe that the expectation of privacy in the home is clearly 'one which a citizen of this state should be entitled to hold,' because 'the home receives heightened constitutional protection.' In light of the importance that we attach to that right in Washington, we are satisfied that public policy supports adoption of a rule that article I, section 7 [of the

Washington constitution] is violated whenever the authorities' fail to inform home dwellers of their right to refuse consent to a warrantless search. After all, as we noted earlier, we have already held that the failure to warn is a factor to be employed in assessing the voluntariness of consent under the more permissive Fourth Amendment standard. In our judgment, further protection for individuals in their home is necessary because, unlike a search warrant, a search resulting from a knock and talk need not be supported by probable cause, or even reasonable suspicion, and the constitutionality of the search might otherwise only be reviewed, if ever, months after the search was conducted at an optional . . . suppression hearing."

*Id.* (internal citations omitted). The court adopted the following rule:

"[W]hen police officers conduct a knock and talk for the purpose of obtaining consent to search a home, and thereby avoid the necessity of obtaining a warrant, they must, prior to entering the home, inform the person from whom consent is sought that he or she may lawfully refuse to consent to the search and that they can revoke, at any time, the consent that they give, and can limit the scope of the consent to certain areas of the home. The failure to provide these warnings, prior to entering the home, vitiates any consent given thereafter."

*Id.* The same holds true whether we are talking about a private dwelling house, an apartment house, a condominium, motel or hotel room, or the like.

I would hold that the totality of the circumstances surrounding this encounter—the late hour of the episode, the presence of multiple officers, the visible weapons, the pounding on the door, the commands and requests to open the door—makes clear that a seizure took place. The record does not support the conclusion that a reasonable person in appellant's position would have felt free to ignore the officers and to continue about his business. A reasonable person in this situation would conclude that the officers would not leave unless the

door was opened. Once appellant had opened the door for the officers, it is unlikely that appellant would have felt free to terminate his encounter with police at that point and refuse the subsequent search of his hotel room. Therefore, appellant was seized within the meaning of the Fourth Amendment on the night in question. Inasmuch as the State concedes that the officers did not have reasonable suspicion or probable cause to seize appellant, the seizure was unlawful. Accordingly, I respectfully dissent.

Chief Judge BELL and Judge ELDRIDGE have authorized me to state that they join in this dissent.